In the
United States Court of Appeals
For the Seventh Circuit

No. 99-2580

FORD OLINGER,

Plaintiff-Appellant,

v.

UNITED STATES GOLF ASSOCIATION,

Defendant-Appellee.


Appeal from the United States District Court
for the Northern District of Indiana, South Bend Division.
No. 3:98-CV-252-RM--Robert L. Miller, Jr., Judge.


Argued February 7, 2000--Decided March 7, 2000


  Before KANNE, ROVNER, and EVANS, Circuit Judges.

  EVANS, Circuit Judge.  This case presents a clash
between big-time sports and the Americans With
Disabilities Act (ADA). It pits the venerable
United States Golf Association (USGA) against a
professional golfer who wants to compete in
America's greatest--and most democratic--golf
tournament, the United States Open.

  Ford Olinger is a highly skilled golfer who,
since 1988, has held a "professional" title by
virtue of a certification he received from the
Professional Golfers Association (the PGA). But
Olinger suffers from bilateral avascular
necrosis, a degenerative condition that
significantly impairs his ability to walk.
Everyone agrees he is a "disabled" person within
the meaning of the ADA. Because of his
disability, Olinger wants to be allowed to ride
in a golf cart as he competes to qualify for the
Open. The USGA balks at this request, arguing
that the ADA does not apply to its tournament and
that, even if it did, the use of a cart by a
player would "fundamentally alter the nature" of
the tournament. The district court, on the latter
argument, granted summary judgment for the USGA.
Today we resolve Olinger's appeal from that
decision.

  The USGA is a private, not-for-profit
association of member golf clubs and golf

courses, chartered for the purpose of promoting and conserving the best interests and the true spirit of the game of golf. The USGA claims no legal power with respect to the game beyond its own championships which it conducts each year in 13 designated categories, such as the U.S. Women's Open, U.S. Senior Open, and U.S. Amateur. Nevertheless, the USGA is regarded as the governing body of golf in the United States by the common and voluntary consent of the golf community, including individual golf enthusiasts everywhere. The USGA is concerned with all aspects of golf, especially preserving the integrity of the game and the conditions under which it is played. The official "Rules of Golf" by the USGA (and the Royal and Ancient Golf Club of St. Andrews, Scotland) is a staple in the bag of all true golfers.

The United States Open is the men's national championship of golf in America. It has been conducted yearly since 1895, with the exception of the war years 1917-18 and 1942-45. It is played at a different premier golf course in June of every year./1 The 100th United States Open golf championship will be contested this year at the historic Pebble Beach course in California.

Past winners of the U.S. Open include legends in the game: Bobby Jones (1923, 1926, 1929, and 1930); Gene Sarazen (1922, 1932); Byron Nelson (1939); Ben Hogan (1948, 1950, 1951, and 1953); Arnold Palmer (1960); Jack Nicklaus (1962, 1967, 1972, and 1980); Gary Player (1965), Hale Irwin (1974, 1979, and 1990); Tom Watson (1982); and Lee Trevino (1968, 1971)./2

The U.S. Open is treated with respect by great players of the game. As John Feinstein reports in his recent work "The Majors" (Little, Brown and Company 1999), golfer Payne Stewart's father "always insisted" he use the formal "William Payne Stewart" on his U.S. Open application because, quoting Payne, "Dad always said this is the United States Open, your national championship, you write down your full name."/3

In a typical year, over 7,000 players submit applications to play in the U.S. Open. All professional golfers can play in local qualifying rounds, along with amateurs who carry at least a 1.4 certified USGA handicap index. Local qualifying rounds in May reduce the field to around 750 for the sectional qualifying rounds, from which close to 100 survivors join about 60 of the world's best golfers who are exempt, based on published criteria, from preliminary rounds. The field for the Open is limited to 156 players.

The USGA holds its local and sectional

qualifying rounds at different courses every year. Competition in the qualifying rounds is keen, often necessitating playoffs to break ties and establish who will advance to further action. Competition in the U.S. Open itself is fierce. In 30 of the 99 U.S. Opens played since 1895, 2 or more competitors were tied at the end of 72 holes of regulation play, requiring a playoff to determine the national champion. And that champion is always the survivor of a brutal ordeal, as the USGA sets up its championship course with narrow fairways and rough so high that even a slightly errant shot puts the player in jail, where he usually faces at least a bogey once he gets to a lightning-fast green. In short, the consensus in the golf world is that the U.S. Open is the greatest test in golf.

This test is controlled by the "Rules of Golf"--34 separate rules and appendices, totaling 144 pages. In addition, the USGA publishes hundreds of interpretations of the rules, applying them to myriad specific facts and circumstances. The USGA also develops and issues a set of "Local Rules and Conditions of Competition for USGA Championships" which apply to all USGA Championships, as well as a "Notice to Competitors" for players competing in each USGA Championship spelling out the local rules that have been adopted by the USGA Championship Committee.

The "Rules of Golf" restricts such things as the physical properties of clubs and balls, the number of clubs players may use during a round, and golfers' behavior while in play. The rules are strict, sometimes even odd, as, for example, the provision that penalizes a player two strokes if he asks an opponent how far away he thinks the green is, because information of that sort is "advice which could influence a stroke."/4 Although the rules do not expressly preclude the use of golf carts, they empower tournament competition committees to set conditions for an event, including whether to prohibit the use of carts.

Golf carts started appearing with increasing regularity on American golf courses in the 1950's. Today they are everywhere. And they are encouraged. For one thing, they often speed up play, and for another, they are great revenue producers. But since 1955 the entry forms for every U.S. Open have informed competitors that "[p]layers shall walk at all times during a stipulated round." The USGA requires competitors to walk the course because it believes that their physical endurance and stamina are important parts of the competition./5

Still, the record in this case discloses that since 1986 the USGA has received 12 requests from 11 different people seeking waivers of the prohibition against using carts in the U.S. Open. The USGA does not have an established procedure for waiving the rule. In fact, only one player since 1895 has ever ridden in a cart while playing in the U.S. Open. Every other player, and there have been tens of thousands, has walked the Open course from start to finish.

Which brings us to Casey Martin. By now, everyone in the golf world and most of the public at large knows about Mr. Martin. He is, like our Mr. Olinger, a disabled professional golfer. Martin sued the PGA Tour (a separate entity unrelated to the USGA) under the ADA for the right to play in its tournaments while riding in a golf cart. Martin won his suit when a federal magistrate judge in Oregon cleared him to play in PGA events, ruling that not doing so would violate the ADA. Martin v. PGA Tour, Inc., 994 F. Supp. 1242 (D. Or. 1998). That decision is on appeal in the United States Court of Appeals for the Ninth Circuit. And although the Martin decision was not binding on it, the USGA voluntarily agreed to abide by the ruling, and so Martin played and rode his cart in the 1998 U.S. Open.

Like Martin, Olinger applied to play in the 1998 Open and asked to use a cart. When the USGA denied his request, he sued under the ADA 4 days before local qualifying was scheduled to get underway in South Bend, Indiana. The district court gave him a TRO and, armed with his court order, Olinger played, but not well, failing to advance to sectional action. Later, after a full trial, the district court sided with the USGA.

Congress enacted the ADA to ensure that individuals with disabilities fully enjoy the goods, services, privileges, and advantages available indiscriminately to other members of the general public. The ADA's mandate extends to three broad, yet distinct, areas: employment (Title I), public services (Title II), and places of public accommodation (Title III). This case can only fit, if at all, under Title III.

Title III of the ADA applies to "place[s] of public accommodation." Regulations broadly define "place of public accommodation" as "a facility, operated by a private entity, whose operations affect commerce and fall within at least one" of the categories set forth in 42 U.S.C. sec. 12181(7):

(A) an inn, hotel, motel, or other place of lodging . . . ;

(B) a restaurant, bar, or other establishment serving food or drink;

(C) a motion picture house, theater, concert hall, stadium, or other place of exhibition or entertainment;

(D) an auditorium, convention center, lecture hall, or other place of public gathering;

(E) a bakery, grocery store, clothing store, hardware store, shopping center, or other sales or rental establishment;

(F) a laundromat, dry-cleaner, bank, barber shop, beauty shop, travel service, shoe repair service, funeral parlor, gas station, office of an accountant or lawyer, pharmacy, insurance office, professional office of a health care provider, hospital, or other service establishment;

(G) a terminal, depot, or other station used for specified public transportation;

(H) a museum, library, gallery, or other place of public display or collection;

(I) a park, zoo, amusement park, or other place of recreation;
(J) a nursery, elementary, secondary, undergraduate, or postgraduate private school, or other place of education;

(K) a day care center, senior citizen center, homeless shelter, food bank, adoption agency, or other social service center establishment; and

(L) a gymnasium, health spa, bowling alley, golf course, or other place of exercise or recreation.

A "golf course" is mentioned in (L) but, as the USGA correctly observes, an entity may simultaneously be both a place of public accommodation and a place that is not fully subject to Title III--in other words, a "mixed use" facility. Pursuant to Justice Department regulations implementing Title III, to the extent that a mixed use facility "is not open to the general public," it "is not subject to the requirements for public accommodations." 28 C.F.R. ch. 1, pt. 36, App. B, at 624. It is this interpretation that the USGA banks on as its reason for claiming that the ADA does not apply to its tournament.

In a nutshell, the USGA argues that the courses where the U.S. Open is played are "mixed use" facilities subject to Title III regulations "outside the ropes" where the general public has

unfettered access to the course but not "inside the ropes," where the actual championship competition is conducted and access is tightly restricted. The USGA concedes that a golf course is listed as one of the examples of a place of public accommodation under the ADA (42 U.S.C. sec. 12181(7)(L)). But the USGA says it is only properly classified as such when it is used for "exercise or recreation," and the U.S. Open is not conducted for those purposes: It is held to identify America's national golf champion.

Following this thinking, places like Green Bay's Lambeau Field and Chicago's Wrigley Field would be "mixed use" facilities. Although they would be subject to the ADA in general, their actual fields of strife--where Packers battle Bears and Cubs play Cardinals--would not be places of public accommodation under the ADA.

While there may be some logic to this contention, we hesitate to embrace it for we can resolve this appeal, as did the district court, on a more narrow ground. Even assuming that the competitive part of the golf course on which the U.S. Open is played is a place of public accommodation covered by the ADA, Mr. Olinger cannot prevail because we believe his use of a cart during the tournament would fundamentally alter the nature of the competition.

Olinger's contention on appeal is that "the USGA failed to present proof--responsive to the disabled golfer's personal circumstances as they interacted with the USGA's event--that in fact allowing a cart would fundamentally alter the event." According to Olinger, trial testimony did not support the district court's conclusion because it "did not bear on Mr. Olinger at all." In addition, Olinger contends that the USGA "presented no proof" that allowing him to use a cart "would impose impossible administrative burdens."

Under Title III of the ADA, an owner, operator, lessee, or lessor of public accommodations must "make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, [or] facilities . . . to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, . . . or accommodations[.]" 42 U.S.C. sec. 12182(b)(2)(A)(ii) (emphasis added).

The "fundamentally alter" concept originated under the Rehabilitation Act, 29 U.S.C. sec. 701 et seq., in Southeastern Community College v. Davis, 442 U.S. 397 (1979). In Davis, a deaf

nursing student who was unable to complete the required clinical work in her program requested that the school permit her to substitute different work. The Supreme Court held that the requested accommodation was unreasonable because the Rehabilitation Act was not intended to accommodate an individual who cannot "meet all of a program's requirements in spite of [a] handicap." 442 U.S. at 406. The Court explained that to lower or to effect substantial modifications of standards to accommodate a handicapped person is not a reasonable modification. "Such a fundamental alteration in the nature of a program is far more than the 'modification' the regulation requires." Id. at 410.

In light of Davis, courts have repeatedly held that the ADA does not require entities to change their basic nature, character, or purpose insofar as that purpose is rational, rather than a pretext for discrimination. See, e.g., Sandison v. Michigan High Sch. Athletic Ass'n, 64 F.3d 1026, 1035 (6th Cir. 1995) (rejecting disabled students' challenge to an athletic age requirement); Pottgen v. Missouri State High Sch. Activities Ass'n, 40 F.3d 926 (8th Cir. 1994) (finding that waiving an essential eligibility standard would fundamentally alter the nature of a youth baseball program). In addition, under both the Rehabilitation Act and the ADA,/6 courts consistently have concluded that an accommodation is not reasonable if it imposes an undue financial and administrative burden. See School Bd. v. Arline, 480 U.S. 273, 287 n.17 (1987) (Rehabilitation Act), and Sandison, 64 F.3d at 1035 (ADA case) ("It is plainly an undue burden to require high school coaches and hired physicians to determine whether [various] factors render a student's age an unfair competitive advantage. . . . It is unreasonable to call upon coaches and physicians to make these near-impossible determinations.").

The district court concluded that "the nature of the competition would be fundamentally altered" if the walking rule were eliminated because it would "remove stamina (at least, a particular type of stamina) from the set of qualities designed to be tested in this competition." As a result, "[c]onditions that now affect a golfer's performance, but which lie beyond the golfer's ability to control--the fatigue born of hills, of heat, of humidity-- would lessen in importance to the competition." Finally, in summarizing its ruling in favor of the USGA, the district court returned to the "nature of the 'program' to which Mr. Olinger seeks access: the U.S. Open" and concluded,

[t]he point of an athletic competition . . . is to decide who, under conditions that are about the same for everyone, can perform an assigned set of tasks better than (not as well as) any other competitor. The set of tasks assigned to the competitor in the U.S. Open includes not merely striking a golf ball with precision, but doing so under greater than usual mental and physical stress. The accommodation Mr. Olinger seeks, while reasonable in a general sense, would alter the fundamental nature of that competition.

These findings are amply supported in the record. For example, Ken Venturi, the winner of the 1964 U.S. Open, testified that physical and mental fatigue and a uniform set of rules for all golfers are integral parts of championship-level golf. Olinger's own expert witness, Dennis Hepler, likewise testified that physical endurance and stamina and uniform rules are critical factors in determining the winner of a championship-level golf competition. Dr. Theodore Holland also testified that physical endurance and stamina are important criteria in determining the national golf champion. As he put it, "[t]here is a lot more to getting . . . around those 72 holes than just hitting the shots."

We find the testimony of Ken Venturi to be particularly persuasive. During his storied career as a PGA professional he competed in 15 Masters tournaments. For the last 31 years he has been the golf analyst for CBS Sports. His testimony regarding the 1964 U.S. Open, by itself, supports the golf community's insistence that all players play all tournaments under the same conditions and rules.

Back in 1964 the U.S. Open was played over 3 days, with 18 holes played on Thursday and Friday and the final 36 holes on Saturday. The temperature hovered near 100 degrees in 1964, and the humidity was at 97 percent. Venturi, like all other competitors, walked the morning round and fired a 66. (When asked his score during the trial, Venturi replied "a 66" but, like all golfers, he could not leave it at that, for he added "with two small misputts. I 3-putted from 12 feet at 17 and missed a 3-footer at 18.") Venturi said he rested for about a half an hour before going out against the advice of his doctor to play the afternoon 18. In the stifling heat and humidity, battling dehydration, Venturi walked the course and, on the verge of collapse, won the tournament. In that tournament everybody played under the same grueling conditions. Venturi explained, "That's the beauty of it." If another competitor would have been riding in a cart, there would have been a "tremendous advantage to the other player," Venturi said.

Finally, Venturi recalled the amazing story of Ben Hogan. Hogan was severely injured in 1949 when his car collided with a Greyhound bus. He was told he would never walk again, let alone play golf. Yet the next year, he walked and won the U.S. Open. During the trial, Venturi was asked if there was any accommodation made to Hogan as a result of his accident. Venturi replied, "They never thought about it. They never thought about carts. And knowing Ben Hogan as well as I have, he wouldn't take one." Olinger's situation, of course, is more dire than was Hogan's in 1950, and we don't mean to suggest that Olinger is any less of a competitor than the great Hall of Famer. We offer Venturi's statement for one reason: it emphasizes the importance and tradition of walking in championship-level tournament golf competition.

The district court also offered a second rationale for ruling in favor of the USGA, the administrative burdens of evaluating requests to waive the walking rule and permit the use of a golf cart. As the court explained, the USGA "would need to develop a system and a fund of expertise to determine whether a given applicant truly needs, or merely wants, or could use but does not need, to ride a cart to compete." The district court thought that this should be unnecessary. We agree.

The focus of our opinion has been on one question: Must the USGA allow Ford Olinger to compete while riding in a golf cart instead of walking? The answer is "no." The question we have not addressed is whether the USGA should give seriously disabled, but otherwise well-qualified, golfers a chance to compete. Compared to most people who play golf, Olinger's skill level is beyond comprehension. And without question, most players would prefer to walk while playing competitive, championship-caliber golf. Surely a player like Olinger would gladly trade in his cart if he could walk a golf course without pain. But the decision on whether the rules of the game should be adjusted to accommodate him is best left to those who hold the future of golf in trust. Because the law does not force the USGA to make the accommodation Olinger seeks, the judgment of the district court is

AFFIRMED.


/1 Its venues are true meccas of tournament golf, places like Winged Foot (Mamaroneck, New York); Medinah (Medinah, Illinois); Shinnecock Hills (Southampton, New York); Merion (Ardmore, Pennsylvania); and Congressional (Bethesda,

Maryland).

/2 Others, of course, could be added to this list. Willie Anderson, for example, a Scotsman who emigrated to the United States just before the turn of the century, was the first four-time U.S. Open winner (1901, 1903, 1904, and 1905), a feat equaled only by Jones, Hogan, and Nicklaus. Anderson is also the only player to win the Open three years in a row, and he had several other close calls as well. He finished second in 1897 when Joe Lloyd, one of the long drivers of the time, eagled 18--the only Open to be won by an eagle on the final hole. He also finished third, fourth twice, and fifth three times. And he set scoring records, including the first-ever 72 score (par) for a round at the Open in 1901. In addition to Anderson, the list could include double Open champions like Walter Hagen, Ralph Guldahl, Julius Boros, Billy Casper, Andy North, Curtis Strange, and Dr. Cary Middlecoff.

/3 Stewart won the U.S. Open in 1991 (at Hazeltine National in Minneapolis) and again last year in a memorable finish at Pinehurst in North Carolina. He will not, of course, defend his championship this June as he died, tragically, in a mysterious plane crash last fall in South Dakota.

/4 Rule 8, USGA "Rules of Golf," 1999-2000.

/5 The prohibition against using golf carts is in effect for all but 2 of the 13 national championships that the USGA conducts. The USGA has permitted competitors to use carts in the Senior Amateur and the Senior Women's Amateur. These events are played in the fall, when school is in session, and there are few caddies available to carry players' bags. Especially because of the age of the competitors, requiring some competitors to carry their own bags while others have caddies would give an advantage to those with caddies. Thus, the USGA has ensured a "level playing field" for all by allowing the use of golf carts in those two championships. Approximately 75 percent of the players in the Senior Amateur and the Senior Women's Amateur use carts.

/6 Because the ADA is patterned in large measure on the Rehabilitation Act, decisions interpreting the Rehabilitation Act and its implementing regulations provide useful guidance as to "the meaning of the same terms in the new law." Vande Zande v. Wisconsin Dep't of Admin., 44 F.3d 538, 542 (7th Cir. 1995).