# PGA TOUR, INC. *v.* MARTIN

No. 00–24.   Argued January 17, 2001—Decided May 29, 2001

662

*H. Bartow Farr III* argued the cause for petitioner. With him on the briefs were *Richard G. Taranto, William J. Maledon,* and *Andrew D. Hurtiwz.*

*Roy L. Reardon* argued the cause for respondent. With him on the brief was *Joseph M. McLaughlin.*

*Deputy Solicitor General Underwood* argued the cause for the United States as *amicus curiae* urging affirmance. With her on the brief were *Solicitor General Waxman, Assistant Attorney General Lee, Patricia A. Millett, Jessica Dunsay Silver,* and *Thomas E. Chandler.*[*]

JUSTICE STEVENS delivered the opinion of the Court.

This case raises two questions concerning the application of the Americans with Disabilities Act of 1990, 104 Stat. 328, 42 U. S. C. § 12101 *et seq.,* to a gifted athlete: first, whether the Act protects access to professional golf tournaments by a qualified entrant with a disability; and second, whether a

---

[*]Briefs of *amici curiae* urging reversal were filed for the Equal Employment Advisory Council by *Ann Elizabeth Reesman;* for ATP Tour, Inc., et al. by *Bradley I. Ruskin;* for the United States Golf Association by *Roy T. Englert, Jr., Lee N. Abrams, James C. Schroeder, Robert M. Dow, Jr.,* and *John W. Vardaman;* and for Kenneth R. Green II by *Gregory D. Smith.*

Briefs of *amici curiae* urging affirmance were filed for the American Association of Adapted Sports Programs et al. by *Anita M. Moorman* and *Lisa Pike Masteralexis;* for the K–T Support Group by *Brian D. Shannon;* for the National Association of Protection and Advocacy Systems et al. by *Sharon Masling, Samuel R. Bagenstos,* and *Neil V. McKittrick;* and for Robert J. Dole et al. by *Robert L. Burgdorf, Jr.,* and *George G. Olsen.*

disabled contestant may be denied the use of a golf cart because it would "fundamentally alter the nature" of the tournaments, § 12182(b)(2)(A)(ii), to allow him to ride when all other contestants must walk.

## I

Petitioner PGA TOUR, Inc., a nonprofit entity formed in 1968, sponsors and cosponsors professional golf tournaments conducted on three annual tours. About 200 golfers participate in the PGA TOUR; about 170 in the NIKE TOUR;[1] and about 100 in the SENIOR PGA TOUR. PGA TOUR and NIKE TOUR tournaments typically are 4-day events, played on courses leased and operated by petitioner. The entire field usually competes in two 18-hole rounds played on Thursday and Friday; those who survive the "cut" play on Saturday and Sunday and receive prize money in amounts determined by their aggregate scores for all four rounds. The revenues generated by television, admissions, concessions, and contributions from cosponsors amount to about $300 million a year, much of which is distributed in prize money.

There are various ways of gaining entry into particular tours. For example, a player who wins three NIKE TOUR events in the same year, or is among the top-15 money winners on that tour, earns the right to play in the PGA TOUR. Additionally, a golfer may obtain a spot in an official tournament through successfully competing in "open" qualifying rounds, which are conducted the week before each tournament. Most participants, however, earn playing privileges in the PGA TOUR or NIKE TOUR by way of a three-stage qualifying tournament known as the "Q-School."

Any member of the public may enter the Q-School by paying a $3,000 entry fee and submitting two letters of reference

---

[1] After the trial of the case, the name of the NIKE TOUR was changed to the Buy.com TOUR.

from, among others, PGA TOUR or NIKE TOUR members. The $3,000 entry fee covers the players' greens fees and the cost of golf carts, which are permitted during the first two stages, but which have been prohibited during the third stage since 1997. Each year, over a thousand contestants compete in the first stage, which consists of four 18-hole rounds at different locations. Approximately half of them make it to the second stage, which also includes 72 holes. Around 168 players survive the second stage and advance to the final one, where they compete over 108 holes. Of those finalists, about a fourth qualify for membership in the PGA TOUR, and the rest gain membership in the NIKE TOUR. The significance of making it into either tour is illuminated by the fact that there are about 25 million golfers in the country.[2]

Three sets of rules govern competition in tour events. First, the "Rules of Golf," jointly written by the United States Golf Association (USGA) and the Royal and Ancient Golf Club of Scotland, apply to the game as it is played, not only by millions of amateurs on public courses and in private country clubs throughout the United States and worldwide, but also by the professionals in the tournaments conducted by petitioner, the USGA, the Ladies' Professional Golf Association, and the Senior Women's Golf Association. Those rules do not prohibit the use of golf carts at any time.[3]

Second, the "Conditions of Competition and Local Rules," often described as the "hard card," apply specifically to petitioner's professional tours. The hard cards for the PGA

---

[2] Generally, to maintain membership in a tour for the succeeding year, rather than go through the Q-School again, a player must perform at a certain level.

[3] Instead, Appendix I to the Rules of Golf lists a number of "optional" conditions, among them one related to transportation: "If it is desired to require players to walk in a competition, the following condition is suggested:

"Players shall walk at all times during a stipulated round." App. 125.

TOUR and NIKE TOUR require players to walk the golf course during tournaments, but not during open qualifying rounds.[4] On the SENIOR PGA TOUR, which is limited to golfers age 50 and older, the contestants may use golf carts. Most seniors, however, prefer to walk.[5]

Third, "Notices to Competitors" are issued for particular tournaments and cover conditions for that specific event. Such a notice may, for example, explain how the Rules of Golf should be applied to a particular water hazard or manmade obstruction. It might also authorize the use of carts to speed up play when there is an unusual distance between one green and the next tee.[6]

The basic Rules of Golf, the hard cards, and the weekly notices apply equally to all players in tour competitions. As one of petitioner's witnesses explained with reference to "the Masters Tournament, which is golf at its very highest level, . . . the key is to have everyone tee off on the first hole under exactly the same conditions and all of them be tested over that 72-hole event under the conditions that exist during those four days of the event." App. 192.

## II

Casey Martin is a talented golfer. As an amateur, he won 17 Oregon Golf Association junior events before he was 15,

---

[4] The PGA TOUR hard card provides: "Players shall walk at all times during a stipulated round unless permitted to ride by the PGA TOUR Rules Committee." *Id.*, at 127. The NIKE TOUR hard card similarly requires walking unless otherwise permitted. *Id.*, at 129. Additionally, as noted, golf carts have not been permitted during the third stage of the Q-School since 1997. Petitioner added this recent prohibition in order to "approximat[e] a PGA TOUR event as closely as possible." *Id.*, at 152.

[5] 994 F. Supp. 1242, 1251 (Ore. 1998).

[6] See, *e. g.*, App. 156–160 (Notices to Competitors for 1997 Bob Hope Chrysler Classic, 1997 AT&T Pebble Beach National Pro-Am, and 1997 Quad City Classic).

and won the state championship as a high school senior. He played on the Stanford University golf team that won the 1994 National Collegiate Athletic Association (NCAA) championship. As a professional, Martin qualified for the NIKE TOUR in 1998 and 1999, and based on his 1999 performance, qualified for the PGA TOUR in 2000. In the 1999 season, he entered 24 events, made the cut 13 times, and had 6 top-10 finishes, coming in second twice and third once.

Martin is also an individual with a disability as defined in the Americans with Disabilities Act of 1990 (ADA or Act).[7] Since birth he has been afflicted with Klippel-Trenaunay-Weber Syndrome, a degenerative circulatory disorder that obstructs the flow of blood from his right leg back to his heart. The disease is progressive; it causes severe pain and has atrophied his right leg. During the latter part of his college career, because of the progress of the disease, Martin could no longer walk an 18-hole golf course.[8] Walking not only caused him pain, fatigue, and anxiety, but also created a significant risk of hemorrhaging, developing blood clots, and fracturing his tibia so badly that an amputation might be required. For these reasons, Stanford made written requests to the Pacific 10 Conference and the NCAA to waive for Martin their rules requiring players to walk and carry their own clubs. The requests were granted.[9]

---

[7] Title 42 U. S. C. § 12102 provides, in part:

"The term 'disability' means, with respect to an individual—

"(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual . . . ."

[8] Before then, even when Martin was in extreme pain, and was offered a cart, he declined. Tr. 564–565.

[9] When asked about the other teams' reaction to Martin's use of a cart, the Stanford coach testified:

"Q. Was there any complaint ever made to you by the coaches when he was allowed a cart that that gave a competitive advantage over the—

"A. Any complaints? No sir, there were exactly—exactly the opposite. Everybody recognized Casey for the person he was, and what he was

When Martin turned pro and entered petitioner's Q-School, the hard card permitted him to use a cart during his successful progress through the first two stages. He made a request, supported by detailed medical records, for permission to use a golf cart during the third stage. Petitioner refused to review those records or to waive its walking rule for the third stage. Martin therefore filed this action. A preliminary injunction entered by the District Court made it possible for him to use a cart in the final stage of the Q-School and as a competitor in the NIKE TOUR and PGA TOUR. Although not bound by the injunction, and despite its support for petitioner's position in this litigation, the USGA voluntarily granted Martin a similar waiver in events that it sponsors, including the U. S. Open.

### III

In the District Court, petitioner moved for summary judgment on the ground that it is exempt from coverage under Title III of the ADA as a "private clu[b] or establishmen[t],"[10] or alternatively, that the play areas of its tour competitions do not constitute places of "public accommodation" within the scope of that Title.[11] The Magistrate Judge concluded that petitioner should be viewed as a commercial enterprise operating in the entertainment industry for the economic benefit of its members rather than as a private

---

doing with his life, and every coach, to my knowledge, and every player wanted Casey in the tournament and they welcomed him there.

"Q. Did anyone contend that that constituted an alteration of the competition to the extent that it didn't constitute the game to your level, the college level?

"A. Not at all, sir." App. 208.

[10] Title 42 U. S. C. §12187 provides: "The provisions of this subchapter shall not apply to private clubs or establishments exempted from coverage under Title II of the Civil Rights Act of 1964 (42 U. S. C. §2000–a(e)) or to religious organizations or entities controlled by religious organizations, including places of worship."

[11] See §12181(7).

club.  Furthermore, after noting that the statutory defini-
tion of public accommodation included a "golf course,"[12] he
rejected petitioner's argument that its competitions are only
places of public accommodation in the areas open to specta-
tors.  The operator of a public accommodation could not, in
his view, "create private enclaves within the facility . . . and
thus relegate the ADA to hop-scotch areas."  984 F. Supp.
1320, 1326–1327 (Ore. 1998).  Accordingly, he denied peti-
tioner's motion for summary judgment.

At trial, petitioner did not contest the conclusion that Mar-
tin has a disability covered by the ADA, or the fact "that his
disability prevents him from walking the course during a
round of golf."  994 F. Supp. 1242, 1244 (Ore. 1998).  Rather,
petitioner asserted that the condition of walking is a sub-
stantive rule of competition, and that waiving it as to
any individual for any reason would fundamentally alter the
nature of the competition.  Petitioner's evidence included
the testimony of a number of experts, among them some
of the greatest golfers in history.  Arnold Palmer,[13] Jack
Nicklaus,[14] and Ken Venturi[15] explained that fatigue can be

---

[12] § 12181(7)(L).

[13] "Q. And fatigue is one of the factors that can cause a golfer at the
PGA Tour level to lose one stroke or more?

"A. Oh, it is.  And it has happened.

"Q. And can one stroke be the difference between winning and not win-
ning a tournament at the PGA Tour level?

"A. As I said, I've lost a few national opens by one stroke."  App. 177.

[14] "Q. Mr. Nicklaus, what is your understanding of the reason why in
these competitive events . . . that competitors are required to walk the
course?

"A. Well, in my opinion, physical fitness and fatigue are part of the game
of golf."  Id., at 190.

[15] "Q. So are you telling the court that this fatigue factor tends to accu-
mulate over the course of the four days of the tournament?

"A. Oh definitely.  There's no doubt.

°          .               .                 .                 .

"Q. Does this fatigue factor that you've talked about, Mr. Venturi, affect
the manner in which you—you perform as a professional out on the golf
course?

a critical factor in a tournament, particularly on the last day when psychological pressure is at a maximum. Their testimony makes it clear that, in their view, permission to use a cart might well give some players a competitive advantage over other players who must walk. They did not, however, express any opinion on whether a cart would give Martin such an advantage.[16]

Rejecting petitioner's argument that an individualized inquiry into the necessity of the walking rule in Martin's case would be inappropriate, the District Court stated that it had "the independent duty to inquire into the purpose of the rule at issue, and to ascertain whether there can be a reasonable modification made to accommodate plaintiff without frustrating the purpose of the rule" and thereby fundamentally altering the nature of petitioner's tournaments. *Id.*, at 1246. The judge found that the purpose of the rule was to inject fatigue into the skill of shotmaking, but that the fatigue injected "by walking the course cannot be deemed significant under normal circumstances." *Id.*, at 1250. Furthermore, Martin presented evidence, and the judge found, that even with the use of a cart, Martin must walk over a mile during

---

"A. Oh, there's no doubt, again, but that, that fatigue does play a big part. It will influence your game. It will influence your shot-making. It will influence your decisions." *Id.*, at 236–237.

[16] "Q. Based on your experience, do you believe that it would fundamentally alter the nature of the competition on the PGA Tour and the Nike Tour if competitors in those events were permitted to use golf carts?

"A. Yes, absolutely.

"Q. Why do you say so, sir?

"A. It would—it would take away the fatigue factor in many ways. It would—it would change the game.

.       .       .       .

"Q. Now, when you say that the use of carts takes away the fatigue factor, it would be an aid, et cetera, again, as I understand it, you are not testifying now about the plaintiff. You are just talking in general terms?

.       .       .       .

"A. Yes, sir." *Id.*, at 238. See also *id.*, at 177–178 (Palmer); *id.*, at 191 (Nicklaus).

an 18-hole round,[17] and that the fatigue he suffers from coping with his disability is "undeniably greater" than the fatigue his able-bodied competitors endure from walking the course. *Id.*, at 1251. As the judge observed:

> "[P]laintiff is in significant pain when he walks, and even when he is getting in and out of the cart. With each step, he is at risk of fracturing his tibia and hemorrhaging. The other golfers have to endure the psychological stress of competition as part of their fatigue; Martin has the same stress plus the added stress of pain and risk of serious injury. As he put it, he would gladly trade the cart for a good leg. To perceive that the cart puts him—with his condition—at a competitive advantage is a gross distortion of reality." *Id.*, at 1251–1252.

As a result, the judge concluded that it would "not fundamentally alter the nature of the PGA Tour's game to accommodate him with a cart." *Id.*, at 1252. The judge accordingly entered a permanent injunction requiring petitioner to permit Martin to use a cart in tour and qualifying events.

On appeal to the Ninth Circuit, petitioner did not challenge the District Court's rejection of its claim that it was exempt as a "private club," but it renewed the contention that during a tournament the portion of the golf course " 'behind the ropes' is not a public accommodation because the public has no right to enter it." 204 F. 3d 994, 997 (2000). The Court of Appeals viewed that contention as resting on the incorrect assumption that the competition among participants was not itself public. The court first pointed out that, as with a private university, "the fact that users of a facility are highly selected does not mean that the facility cannot be

---

[17] "In the first place, he does walk while on the course—even with a cart, he must move from cart to shot and back to the cart. In essence, he still must walk approximately 25% of the course. On a course roughly five miles in length, Martin will walk 1¼ miles." 994 F. Supp., at 1251.

a public accommodation." *Id.*, at 998.[18] In its opinion, the competition to enter the select circle of PGA TOUR and NIKE TOUR golfers was comparable because "[a]ny member of the public who pays a $3000 entry fee and supplies two letters of recommendation may try out in the qualifying school." *Id.*, at 999. The court saw "no justification in reason or in the statute to draw a line beyond which the performance of athletes becomes so excellent that a competition restricted to their level deprives its situs of the character of a public accommodation." *Ibid.* Nor did it find a basis for distinguishing between "use of a place of public accommodation for pleasure and use in the pursuit of a living." *Ibid.* Consequently, the Court of Appeals concluded that golf courses remain places of public accommodation during PGA tournaments. *Ibid.*

On the merits, because there was no serious dispute about the fact that permitting Martin to use a golf cart was both a reasonable and a necessary solution to the problem of providing him access to the tournaments, the Court of Appeals regarded the central dispute as whether such permission would "fundamentally alter" the nature of the PGA TOUR or NIKE TOUR. Like the District Court, the Court of Appeals viewed the issue not as "whether use of carts generally would fundamentally alter the competition, but whether the use of a cart by Martin would do so." *Id.*, at 1001. That issue turned on "an intensively fact-based inquiry," and, the court concluded, had been correctly resolved by the trial judge. In its words, "[a]ll that the cart does is permit Martin access to a type of competition in which he otherwise could not engage because of his disability." *Id.*, at 1000.

---

[18] It explained: "For example, Title III includes in its definition 'secondary, undergraduate, or post-graduate private school[s].' 42 U. S. C. § 12181(7)(J). The competition to enter the most elite private universities is intense, and a relatively select few are admitted. That fact clearly does not remove the universities from the statute's definition as places of public accommodation." 204 F. 3d, at 998.

The day after the Ninth Circuit ruled in Martin's favor, the Seventh Circuit came to a contrary conclusion in a case brought against the USGA by a disabled golfer who failed to qualify for "America's greatest—and most democratic—golf tournament, the United States Open." *Olinger* v. *United States Golf Assn.*, 205 F. 3d 1001 (2000).[19] The Seventh Circuit endorsed the conclusion of the District Court in that case that "the nature of the competition would be fundamentally altered if the walking rule were eliminated because it would remove stamina (at least a particular type of stamina) from the set of qualities designed to be tested in this competition." *Id.*, at 1006 (internal quotation marks omitted). In the Seventh Circuit's opinion, the physical ordeals endured by Ken Venturi and Ben Hogan when they walked to their Open victories in 1964 and 1950 amply demonstrated the importance of stamina in such a tournament.[20] As an alternative basis for its holding, the court also concluded that the ADA does not require the USGA to bear "the administrative burdens of evaluating requests to waive the walking rule and permit the use of a golf cart." *Id.*, at 1007.

Although the Seventh Circuit merely assumed that the ADA applies to professional golf tournaments, and therefore did not disagree with the Ninth on the threshold coverage issue, our grant of certiorari, 530 U. S. 1306 (2000), encompasses that question as well as the conflict between those courts.

## IV

Congress enacted the ADA in 1990 to remedy widespread discrimination against disabled individuals. In studying the need for such legislation, Congress found that "historically, society has tended to isolate and segregate individuals with

---

[19]The golfer in the Seventh Circuit case, Ford Olinger, suffers from bilateral avascular necrosis, a degenerative condition that significantly hinders his ability to walk.

[20]For a description of the conditions under which they played, see *Olinger* v. *United States Golf Assn.*, 205 F. 3d, at 1006–1007.

disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem." 42 U. S. C. § 12101(a)(2); see § 12101(a)(3) ("[D]iscrimination against individuals with disabilities persists in such critical areas as employment, housing, public accommodations, education, transportation, communication, recreation, institutionalization, health services, voting, and access to public services"). Congress noted that the many forms such discrimination takes include "outright intentional exclusion" as well as the "failure to make modifications to existing facilities and practices." § 12101(a)(5). After thoroughly investigating the problem, Congress concluded that there was a "compelling need" for a "clear and comprehensive national mandate" to eliminate discrimination against disabled individuals, and to integrate them "into the economic and social mainstream of American life." S. Rep. No. 101–116, p. 20 (1989); H. R. Rep. No. 101–485, pt. 2, p. 50 (1990).

In the ADA, Congress provided that broad mandate. See 42 U. S. C. § 12101(b). In fact, one of the Act's "most impressive strengths" has been identified as its "comprehensive character," Hearings on S. 933 before the Senate Committee on Labor and Human Resources and the Subcommittee on the Handicapped, 101st Cong., 1st Sess., 197 (1989) (statement of Attorney General Thornburgh), and accordingly the Act has been described as "a milestone on the path to a more decent, tolerant, progressive society," *Board of Trustees of Univ. of Ala.* v. *Garrett,* 531 U. S. 356, 375 (2001) (KENNEDY, J., concurring). To effectuate its sweeping purpose, the ADA forbids discrimination against disabled individuals in major areas of public life, among them employment (Title I of the Act),[21] public services (Title II),[22] and public accommodations (Title III).[23] At issue now, as a threshold matter, is

---

[21] 42 U. S. C. §§ 12111–12117.

[22] §§ 12131–12165.

[23] §§ 12181–12189.

the applicability of Title III to petitioner's golf tours and qualifying rounds, in particular to petitioner's treatment of a qualified disabled golfer wishing to compete in those events.

Title III of the ADA prescribes, as a "[g]eneral rule":

> "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U. S. C. § 12182(a).

The phrase "public accommodation" is defined in terms of 12 extensive categories,[24] which the legislative history indicates "should be construed liberally" to afford people with disabili-

---

[24] "(A) an inn, hotel, motel, or other place of lodging, except for an establishment located within a building that contains not more than five rooms for rent or hire and that is actually occupied by the proprietor of such establishment as the residence of such proprietor;

"(B) a restaurant, bar, or other establishment serving food or drink;

"(C) a motion picture house, theater, concert hall, stadium, or other place of exhibition or entertainment;

"(D) an auditorium, convention center, lecture hall, or other place of public gathering;

"(E) a bakery, grocery store, clothing store, hardware store, shopping center, or other sales or rental establishment;

"(F) a laundromat, dry-cleaner, bank, barber shop, beauty shop, travel service, shoe repair service, funeral parlor, gas station, office of an accountant or lawyer, pharmacy, insurance office, professional office of a health care provider, hospital, or other service establishment;

"(G) a terminal, depot, or other station used for specified public transportation;

"(H) a museum, library, gallery, or other place of display or collection;

"(I) a park, zoo, amusement park, or other place of recreation;

"(J) a nursery, elementary, secondary, undergraduate, or postgraduate private school, or other place of education;

"(K) a day care center, senior citizen center, homeless shelter, food bank, adoption agency, or other social service center establishment; and

"(L) a gymnasium, health spa, bowling alley, *golf course*, or other place of exercise or recreation." § 12181(7) (emphasis added).

ties "equal access" to the wide variety of establishments available to the nondisabled.[25]

It seems apparent, from both the general rule and the comprehensive definition of "public accommodation," that petitioner's golf tours and their qualifying rounds fit comfortably within the coverage of Title III, and Martin within its protection. The events occur on "golf course[s]," a type of place specifically identified by the Act as a public accommodation. § 12181(7)(L). In addition, at all relevant times, petitioner "leases" and "operates" golf courses to conduct its Q-School and tours. § 12182(a). As a lessor and operator of golf courses, then, petitioner must not discriminate against any "individual" in the "full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations" of those courses. *Ibid.* Certainly, among the "privileges" offered by petitioner on the courses are those of competing in the Q-School and playing in the tours; indeed, the former is a privilege for which thousands of individuals from the general public pay, and the latter is one for which they vie. Martin, of course, is one of those individuals. It would therefore appear that Title III of the ADA, by its plain terms, prohibits petitioner from denying Martin equal access to its tours on the basis of his disability. Cf. *Pennsylvania Dept. of Corrections* v. *Yeskey*, 524 U. S. 206, 209 (1998) (holding that text of Title II's prohibition of discrimination by "public entities" against disabled individuals "unmistakably includes State prisons and prisoners within its coverage").

Petitioner argues otherwise. To be clear about its position, it does not assert (as it did in the District Court) that it is a private club altogether exempt from Title III's coverage. In fact, petitioner admits that its tournaments are conducted at places of public accommodation.[26] Nor does petitioner contend (as it did in both the District Court and

---

[25] S. Rep. No. 101–116, p. 59 (1989); H. R. Rep. No. 101–485, pt. 2, p. 100 (1990).

[26] Reply Brief for Petitioner 1–2.

the Court of Appeals) that the competitors' area "behind the ropes" is not a public accommodation, notwithstanding the status of the rest of the golf course. Rather, petitioner reframes the coverage issue by arguing that the competing golfers are not members of the class protected by Title III of the ADA.[27]

According to petitioner, Title III is concerned with discrimination against "clients and customers" seeking to obtain "goods and services" at places of public accommodation, whereas it is Title I that protects persons who work at such places.[28] As the argument goes, petitioner operates not a "golf course" during its tournaments but a "place of exhibition or entertainment," 42 U. S. C. § 12181(7)(C), and a professional golfer such as Martin, like an actor in a theater production, is a provider rather than a consumer of the entertainment that petitioner sells to the public. Martin therefore cannot bring a claim under Title III because he is not one of the "*'clients or customers* of the covered public accommodation.'"[29] Rather, Martin's claim of discrimination is "job-related"[30] and could only be brought under Title I—but that Title does not apply because he is an independent contractor (as the District Court found) rather than an employee.

The reference to "clients or customers" that petitioner quotes appears in 42 U. S. C. § 12182(b)(1)(A)(iv), which

---

[27] Martin complains that petitioner's failure to make this exact argument below precludes its assertion here. However, the Title III coverage issue was raised in the lower courts, petitioner advanced this particular argument in support of its position on the issue in its petition for certiorari, and the argument was fully briefed on the merits by both parties. Given the importance of the issue, we exercise our discretion to consider it. See *Harris Trust and Sav. Bank* v. *Salomon Smith Barney Inc.*, 530 U. S. 238, 245–246, n. 2 (2000); *Carlson* v. *Green*, 446 U. S. 14, 17, n. 2 (1980).

[28] Brief for Petitioner 10, 11.

[29] *Id.*, at 19 (quoting 42 U. S. C. § 12182(b)(1)(A)(iv)).

[30] Brief for Petitioner 15; see also *id.*, at 16 (Martin's claim "is nothing more than a straightforward discrimination-in-the-workplace complaint").

states: "For purposes of clauses (i) through (iii) of this subparagraph, the term 'individual or class of individuals' refers to the clients or customers of the covered public accommodation that enters into the contractual, licensing or other arrangement." Clauses (i) through (iii) of the subparagraph prohibit public accommodations from discriminating against a disabled "individual or class of individuals" in certain ways[31] either directly or indirectly through contractual arrangements with other entities. Those clauses make clear on the one hand that their prohibitions cannot be avoided by means of contract, while clause (iv) makes clear on the other hand that contractual relationships will not expand a public accommodation's obligations under the subparagraph beyond its own clients or customers.

As petitioner recognizes, clause (iv) is not literally applicable to Title III's general rule prohibiting discrimination against disabled individuals.[32] Title III's broad general rule contains no express "clients or customers" limitation, § 12182(a), and § 12182(b)(1)(A)(iv) provides that its limitation is only "[f]or purposes of" the clauses in that separate subparagraph. Nevertheless, petitioner contends that clause (iv)'s restriction of the subparagraph's coverage to the clients or customers of public accommodations fairly describes the scope of Title III's protection as a whole.

We need not decide whether petitioner's construction of the statute is correct, because petitioner's argument falters even on its own terms. If Title III's protected class were limited to "clients or customers," it would be entirely appropriate to classify the golfers who pay petitioner $3,000 for the chance to compete in the Q-School and, if successful, in the subsequent tour events, as petitioner's clients or custom-

---

[31] Clause (i) prohibits the denial of participation, clause (ii) participation in unequal benefits, and clause (iii) the provision of separate benefits.

[32] Brief for Petitioner 20 (clause (iv) "applies directly just to subsection 12182(b)"); Reply Brief for Petitioner 4, n. 1 (clause (iv) "does not apply directly to the general provision prohibiting discrimination").

ers. In our view, petitioner's tournaments (whether situated at a "golf course" or at a "place of exhibition or entertainment") simultaneously offer at least two "privileges" to the public—that of watching the golf competition and that of competing in it. Although the latter is more difficult and more expensive to obtain than the former, it is nonetheless a privilege that petitioner makes available to members of the general public. In consideration of the entry fee, any golfer with the requisite letters of recommendation acquires the opportunity to qualify for and compete in petitioner's tours. Additionally, any golfer who succeeds in the open qualifying rounds for a tournament may play in the event. That petitioner identifies one set of clients or customers that it serves (spectators at tournaments) does not preclude it from having another set (players in tournaments) against whom it may not discriminate. It would be inconsistent with the literal text of the statute as well as its expansive purpose to read Title III's coverage, even given petitioner's suggested limitation, any less broadly.[33]

---

[33] Contrary to the dissent's suggestion, our view of the Q-School does not make "everyone who seeks a job" at a public accommodation, through "an open tryout" or otherwise, "a customer." *Post,* at 697 (opinion of SCALIA, J.). Unlike those who successfully apply for a job at a place of public accommodation, or those who successfully bid for a contract, the golfers who qualify for petitioner's tours play at their own pleasure (perhaps, but not necessarily, for prize money), and although they commit to playing in at least 15 tournaments, they are not bound by any obligations typically associated with employment. See, *e. g.,* App. 260 (trial testimony of PGA commissioner Timothy Finchem) (petitioner lacks control over when and where tour members compete, and over their manner of performance outside the rules of competition). Furthermore, unlike athletes in "other professional sports, such as baseball," *post,* at 697, in which players are employed by their clubs, the golfers on tour are not employed by petitioner or any related organizations. The record does not support the proposition that the purpose of the Q-School "is to hire," *ibid.,* rather than to narrow the field of participants in the sporting events that petitioner sponsors at places of public accommodation.

Our conclusion is consistent with case law in the analogous context of Title II of the Civil Rights Act of 1964, 78 Stat. 243, 42 U. S. C. § 2000a *et seq.* Title II of that Act prohibits public accommodations from discriminating on the basis of race, color, religion, or national origin. § 2000a(a). In *Daniel* v. *Paul,* 395 U. S. 298, 306 (1969), applying Title II to the Lake Nixon Club in Little Rock, Arkansas, we held that the definition of a "place of exhibition or entertainment," as a public accommodation, covered participants "in some sport or activity" as well as "spectators or listeners." We find equally persuasive two lower court opinions applying Title II specifically to golfers and golf tournaments. In *Evans* v. *Laurel Links, Inc.,* 261 F. Supp. 474, 477 (ED Va. 1966), a class action brought to require a commercial golf establishment to permit black golfers to play on its course, the District Court held that Title II "is not limited to spectators if the place of exhibition or entertainment provides facilities for the public to participate in the entertainment."[34] And in *Wesley* v. *Savannah,* 294 F. Supp. 698 (SD Ga. 1969), the District Court found that a private association violated Title II when it limited entry in a golf tournament on a municipal course to its own members but permitted all (and only) white golfers who paid the membership and entry fees to compete.[35] These cases support our conclusion that, as a public accommodation during its tours and qualifying rounds, petitioner may not discriminate against either spectators or competitors on the basis of disability.

## V

As we have noted, 42 U. S. C. § 12182(a) sets forth Title III's general rule prohibiting public accommodations from

---

[34] Title II of the Civil Rights Act of 1964 includes in its definition of "public accommodation" a "place of exhibition or entertainment" but does not specifically list a "golf course" as an example. See 42 U. S. C. § 2000a(b).

[35] Under petitioner's theory, Title II would not preclude it from discriminating against golfers on racial grounds. App. 197; Tr. of Oral Arg. 11–12.

discriminating against individuals because of their disabilities. The question whether petitioner has violated that rule depends on a proper construction of the term "discrimination," which is defined by Title III to include

"a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, *unless the entity can demonstrate that making such modifications would fundamentally alter the nature* of such goods, services, facilities, privileges, advantages, or accommodations." § 12182(b)(2)(A)(ii) (emphasis added).

Petitioner does not contest that a golf cart is a reasonable modification that is necessary if Martin is to play in its tournaments. Martin's claim thus differs from one that might be asserted by players with less serious afflictions that make walking the course uncomfortable or difficult, but not beyond their capacity. In such cases, an accommodation might be reasonable but not necessary. In this case, however, the narrow dispute is whether allowing Martin to use a golf cart, despite the walking requirement that applies to the PGA TOUR, the NIKE TOUR, and the third stage of the Q-School, is a modification that would "fundamentally alter the nature" of those events.

In theory, a modification of petitioner's golf tournaments might constitute a fundamental alteration in two different ways. It might alter such an essential aspect of the game of golf that it would be unacceptable even if it affected all competitors equally; changing the diameter of the hole from three to six inches might be such a modification.[36] Alternatively, a less significant change that has only a peripheral

---

[36] Cf. *post*, at 701 (SCALIA, J., dissenting) ("I suppose there is some point at which the rules of a well-known game are changed to such a degree that no reasonable person would call it the same game").

impact on the game itself might nevertheless give a disabled player, in addition to access to the competition as required by Title III, an advantage over others and, for that reason, fundamentally alter the character of the competition.[37]  We are not persuaded that a waiver of the walking rule for Martin would work a fundamental alteration in either sense.[38]

As an initial matter, we observe that the use of carts is not itself inconsistent with the fundamental character of the game of golf.  From early on, the essence of the game has been shotmaking—using clubs to cause a ball to progress from the teeing ground to a hole some distance away with as few strokes as possible.[39]  That essential aspect of the game

---

[37] Accord, *post*, at 703 (SCALIA, J., dissenting) ("The statute seeks to assure that a disabled person's disability will not deny him *equal access* to (among other things) competitive sporting events—not that his disability will not deny him an *equal chance to win* competitive sporting events").

[38] As we have noted, the statute contemplates three inquiries: whether the requested modification is "reasonable," whether it is "necessary" for the disabled individual, and whether it would "fundamentally alter the nature of" the competition.  42 U. S. C. § 12182(b)(2)(A)(ii).  Whether one question should be decided before the others likely will vary from case to case, for in logic there seems to be no necessary priority among the three.  In routine cases, the fundamental alteration inquiry may end with the question whether a rule is essential.  Alternatively, the specifics of the claimed disability might be examined within the context of what is a reasonable or necessary modification.  Given the concession by petitioner that the modification sought is reasonable and necessary, and given petitioner's reliance on the fundamental alteration provision, we have no occasion to consider the alternatives in this case.

[39] Golf is an ancient game, tracing its ancestry to Scotland, and played by such notables as Mary Queen of Scots and her son James.  That shotmaking has been the essence of golf since early in its history is reflected in the first recorded rules of golf, published in 1744 for a tournament on the Leith Links in Edinburgh:

"*Articles & Laws in Playing at Golf*

"1. You must Tee your Ball, within a Club's length of the [previous] Hole.

"2. Your Tee must be upon the Ground.

"3. You are not to change the Ball which you Strike off the Tee.

684

is still reflected in the very first of the Rules of Golf, which declares: "The Game of Golf consists in playing a ball from the *teeing ground* into the hole by a *stroke* or successive strokes in accordance with the rules." Rule 1-1, Rules of Golf, App. 104 (emphasis in original). Over the years, there have been many changes in the players' equipment, in golf course design, in the Rules of Golf, and in the method of transporting clubs from hole to hole.[40] Originally, so few clubs were used that each player could carry them without

---

"4. You are not to remove, Stones, Bones or any Break Club for the sake of playing your Ball, Except upon the fair Green/& that only/ within a Club's length of your Ball.

"5. If your Ball comes among Water, or any Watery Filth, you are at liberty to take out your Ball & bringing it behind the hazard and Teeing it, you may play it with any Club and allow your Adversary a Stroke for so getting out your Ball.

"6. If your Balls be found anywhere touching one another, You are to lift the first Ball, till you play the last.

"7. At Holling, you are to play your Ball honestly for the Hole, and, not to play upon your Adversary's Ball, not lying in your way to the Hole.

"8. If you should lose your Ball, by its being taken up, or any other way, you are to go back to the Spot, where you struck last & drop another Ball, And allow your Adversary a Stroke for the misfortune.

"9. No man at Holling his Ball, is to be allowed, to mark his way to the Hole with his Club or, any thing else.

"10. If a Ball be stopp'd by any person, Horse, Dog, or any thing else, The Ball so stop'd must be play'd where it lyes.

"11. If you draw your Club, in order to Strike & proceed so far in the Stroke, as to be bringing down your Club; If then, your Club shall break, in, any way, it is to be Accounted a Stroke.

"12. He, whose Ball lyes farthest from the Hole is obliged to play first.

"13. Neither Trench, Ditch, or Dyke, made for the preservation of the Links, nor the Scholar's Holes or the Soldier's Lines, Shall be accounted a Hazard; But the Ball is to be taken out/Teed/and play'd with any Iron Club." K. Chapman, Rules of the Green 14–15 (1997).

[40] See generally M. Campbell, The Random House International Encyclopedia of Golf 9–57 (1991); Golf Magazine's Encyclopedia of Golf 1–17 (2d ed. 1993).

a bag. Then came golf bags, caddies, carts that were pulled by hand, and eventually motorized carts that carried players as well as clubs. "Golf carts started appearing with increasing regularity on American golf courses in the 1950's. Today they are everywhere. And they are encouraged. For one thing, they often speed up play, and for another, they are great revenue producers."[41] There is nothing in the Rules of Golf that either forbids the use of carts or penalizes a player for using a cart. That set of rules, as we have observed, is widely accepted in both the amateur and professional golf world as the rules of the game.[42] The walking rule that is contained in petitioner's hard cards, based on an optional condition buried in an appendix to the Rules of Golf,[43] is not an essential attribute of the game itself.

Indeed, the walking rule is not an indispensable feature of tournament golf either. As already mentioned, petitioner permits golf carts to be used in the SENIOR PGA TOUR, the open qualifying events for petitioner's tournaments, the first two stages of the Q-School, and, until 1997, the third stage of the Q-School as well. See *supra,* at 665–667. Moreover, petitioner allows the use of carts during certain tournament rounds in both the PGA TOUR and the NIKE

---

[41] *Olinger* v. *United States Golf Assn.,* 205 F. 3d 1001, 1003 (CA7 2000).

[42] On this point, the testimony of the immediate past president of the USGA (and one of petitioner's witnesses at trial) is illuminating:

"Tell the court, if you would, Ms. Bell, who it is that plays under these Rules of Golf . . . ?

"A. Well, these are the rules of the game, so all golfers. These are for all people who play the game.

"Q. So the two amateurs that go out on the weekend to play golf together would—would play by the Rules of Golf?

"A. We certainly hope so.

"Q. Or a tournament that is conducted at a private country club for its members, is it your understanding that that would typically be conducted under the Rules of Golf?

"A. Well, that's—that's right. If you want to play golf, you need to play by these rules." App. 239.

[43] See n. 3, *supra.*

TOUR. See *supra*, at 667, and n. 6. In addition, although the USGA enforces a walking rule in most of the tournaments that it sponsors, it permits carts in the Senior Amateur and the Senior Women's Amateur championships.[44]

Petitioner, however, distinguishes the game of golf as it is generally played from the game that it sponsors in the PGA TOUR, NIKE TOUR, and (at least recently) the last stage of the Q-School—golf at the "highest level." According to petitioner, "[t]he goal of the highest-level competitive athletics is to assess and compare the performance of different competitors, a task that is meaningful only if the competitors are subject to identical substantive rules."[45] The waiver of any possibly "outcome-affecting" rule for a contestant would violate this principle and therefore, in petitioner's view, fundamentally alter the nature of the highest level athletic event.[46] The walking rule is one such rule, petitioner submits, because its purpose is "to inject the element of fatigue into the skill of shot-making,"[47] and thus its effect may be the critical loss of a stroke. As a consequence, the reasonable modification Martin seeks would fundamentally alter the nature of petitioner's highest level tournaments even if he were the only person in the world who has both the talent to compete in those elite events and a disability sufficiently serious that he cannot do so without using a cart.

The force of petitioner's argument is, first of all, mitigated by the fact that golf is a game in which it is impossible to guarantee that all competitors will play under exactly the

---

[44] Furthermore, the USGA's handicap system, used by over 4 million amateur golfers playing on courses rated by the USGA, does not consider whether a player walks or rides in a cart, or whether she uses a caddy or carries her own clubs. Rather, a player's handicap is determined by a formula that takes into account the average score in the 10 best of her 20 most recent rounds, the difficulty of the different courses played, and whether or not a round was a "tournament" event.

[45] Brief for Petitioner 13.

[46] *Id.*, at 37.

[47] 994 F. Supp., at 1250.

same conditions or that an individual's ability will be the sole determinant of the outcome. For example, changes in the weather may produce harder greens and more head winds for the tournament leader than for his closest pursuers. A lucky bounce may save a shot or two.[48] Whether such happenstance events are more or less probable than the likelihood that a golfer afflicted with Klippel-Trenaunay-Weber Syndrome would one day qualify for the NIKE TOUR and PGA TOUR, they at least demonstrate that pure chance may have a greater impact on the outcome of elite golf tournaments than the fatigue resulting from the enforcement of the walking rule.

Further, the factual basis of petitioner's argument is undermined by the District Court's finding that the fatigue from walking during one of petitioner's 4-day tournaments cannot be deemed significant. The District Court credited the testimony of a professor in physiology and expert on fatigue, who calculated the calories expended in walking a golf course (about five miles) to be approximately 500 calories— "'nutritionally . . . less than a Big Mac.'" 994 F. Supp., at 1250. What is more, that energy is expended over a 5-hour period, during which golfers have numerous intervals for rest and refreshment. In fact, the expert concluded, because golf is a low intensity activity, fatigue from the game is primarily a psychological phenomenon in which stress and motivation are the key ingredients. And even under conditions of severe heat and humidity, the critical factor in fatigue is fluid loss rather than exercise from walking.

Moreover, when given the option of using a cart, the majority of golfers in petitioner's tournaments have chosen to

---

[48] A drive by Andrew Magee earlier this year produced a result that he neither intended nor expected. While the foursome ahead of him was still on the green, he teed off on a 322-yard par four. To his surprise, the ball not only reached the green, but also bounced off Tom Byrum's putter and into the hole. Davis, Magee Gets Ace on Par-4, Ariz. Republic, Jan. 26, 2001, p. C16, 2001 WL 8510792.

walk, often to relieve stress or for other strategic reasons.[49] As NIKE TOUR member Eric Johnson testified, walking allows him to keep in rhythm, stay warmer when it is chilly, and develop a better sense of the elements and the course than riding a cart.[50]

Even if we accept the factual predicate for petitioner's argument—that the walking rule is "outcome affecting" because fatigue may adversely affect performance—its legal position is fatally flawed. Petitioner's refusal to consider Martin's personal circumstances in deciding whether to accommodate his disability runs counter to the clear language and purpose of the ADA. As previously stated, the ADA was enacted to eliminate discrimination against "individuals" with disabilities, 42 U. S. C. § 12101(b)(1), and to that end Title III of the Act requires without exception that any "policies, practices, or procedures" of a public accommodation be reasonably modified for disabled "individuals" as necessary to afford access unless doing so would fundamentally alter what is offered, § 12182(b)(2)(A)(ii). To comply with this command, an individualized inquiry must be made to determine whether a specific modification for a particular person's disability would be reasonable under the circumstances as well as necessary for that person, and yet at the same time not work a fundamental alteration. See S. Rep. No. 101–116, at 61; H. R. Rep. No. 101–485, pt. 2, at 102 (public accommodations "are required to make decisions based on facts applicable to individuals"). Cf. *Sutton* v. *United Air Lines, Inc.*, 527 U. S. 471, 483 (1999) ("[W]hether a person has a disability under the ADA is an individualized inquiry").

---

[49] That has been so not only in the SENIOR PGA TOUR and the first two stages of the Q-School, but also, as Martin himself noticed, in the third stage of the Q-School after petitioner permitted everyone to ride rather than just waiving the walking rule for Martin as required by the District Court's injunction.

[50] App. 201. See also *id.*, at 179–180 (deposition testimony of Gerry Norquist); *id.*, at 225–226 (trial testimony of Harry Toscano).

To be sure, the waiver of an essential rule of competition for anyone would fundamentally alter the nature of petitioner's tournaments. As we have demonstrated, however, the walking rule is at best peripheral to the nature of petitioner's athletic events, and thus it might be waived in individual cases without working a fundamental alteration. Therefore, petitioner's claim that all the substantive rules for its "highest-level" competitions are sacrosanct and cannot be modified under any circumstances is effectively a contention that it is exempt from Title III's reasonable modification requirement. But that provision carves out no exemption for elite athletics, and given Title III's coverage not only of places of "exhibition or entertainment" but also of "golf course[s]," 42 U. S. C. §§ 12181(7)(C), (L), its application to petitioner's tournaments cannot be said to be unintended or unexpected, see §§ 12101(a)(1), (5). Even if it were, "the fact that a statute can be applied in situations not expressly anticipated by Congress does not demonstrate ambiguity. It demonstrates breadth." *Pennsylvania Dept. of Corrections* v. *Yeskey*, 524 U. S., at 212 (internal quotation marks omitted).[51]

---

[51] Hence, petitioner's questioning of the ability of courts to apply the reasonable modification requirement to athletic competition is a complaint more properly directed to Congress, which drafted the ADA's coverage broadly, than to us. Even more misguided is JUSTICE SCALIA's suggestion that Congress did not place that inquiry into the hands of the courts at all. According to the dissent, the game of golf as sponsored by petitioner is, like all sports games, the sum of its "arbitrary rules," and no one, including courts, "can pronounce one or another of them to be 'nonessential' if the rulemaker (here the PGA TOUR) deems it to be essential." *Post*, at 700. Whatever the merit of JUSTICE SCALIA's postmodern view of "What Is [Sport]," *ibid.*, it is clear that Congress did not enshrine it in Title III of the ADA. While Congress expressly exempted "private clubs or establishments" and "religious organizations or entities" from Title III's coverage, 42 U. S. C. § 12187, Congress made no such exception for athletic competitions, much less did it give sports organizations *carte blanche* authority to exempt themselves from the fundamental alteration inquiry by deeming any rule, no matter how peripheral to the competition, to be

Under the ADA's basic requirement that the need of a disabled person be evaluated on an individual basis, we have no doubt that allowing Martin to use a golf cart would not fundamentally alter the nature of petitioner's tournaments. As we have discussed, the purpose of the walking rule is to subject players to fatigue, which in turn may influence the outcome of tournaments. Even if the rule does serve that purpose, it is an uncontested finding of the District Court that Martin "easily endures greater fatigue even with a cart than his able-bodied competitors do by walking." 994 F. Supp., at 1252. The purpose of the walking rule is therefore not compromised in the slightest by allowing Martin to use a cart. A modification that provides an exception to a peripheral tournament rule without impairing its purpose cannot be said to "fundamentally alter" the tournament. What it can be said to do, on the other hand, is to allow Martin the chance to qualify for, and compete in, the athletic events petitioner offers to those members of the public who have the skill and desire to enter. That is exactly what the ADA requires.[52] As a result, Martin's request for a waiver of the walking rule should have been granted.

The ADA admittedly imposes some administrative burdens on the operators of places of public accommodation that could be avoided by strictly adhering to general rules and policies that are entirely fair with respect to the able-bodied but that may indiscriminately preclude access by qualified persons with disabilities.[53] But surely, in a case of this kind,

essential. In short, JUSTICE SCALIA's reading of the statute renders the word "fundamentally" largely superfluous, because it treats the alteration of any rule governing an event at a public accommodation to be a fundamental alteration.

[52] On this fundamental point, the dissent agrees. See *post*, at 699 ("The PGA TOUR cannot deny respondent *access* to that game because of his disability").

[53] However, we think petitioner's contention that the task of assessing requests for modifications will amount to a substantial burden is overstated. As Martin indicates, in the three years since he requested the

Congress intended that an entity like the PGA not only give individualized attention to the handful of requests that it might receive from talented but disabled athletes for a modification or waiver of a rule to allow them access to the competition, but also carefully weigh the purpose, as well as the letter, of the rule before determining that no accommodation would be tolerable.

The judgment of the Court of Appeals is affirmed.

*It is so ordered.*

JUSTICE SCALIA, with whom JUSTICE THOMAS joins, dissenting.

In my view today's opinion exercises a benevolent compassion that the law does not place it within our power to impose. The judgment distorts the text of Title III, the structure of the ADA, and common sense. I respectfully dissent.

I

The Court holds that a professional sport is a place of public accommodation and that respondent is a "custome[r]" of "competition" when he practices his profession. *Ante*, at 679–680. It finds, *ante*, at 680, that this strange conclusion is compelled by the "literal text" of Title III of the Americans with Disabilities Act of 1990 (ADA), 42 U. S. C. § 12101 *et seq.*, by the "expansive purpose" of the ADA, and by the fact that Title II of the Civil Rights Act of 1964, 42 U. S. C. § 2000a(a), has been applied to an amusement park and public golf courses. I disagree.

The ADA has three separate titles: Title I covers employment discrimination, Title II covers discrimination by

___

use of a cart, no one else has sued the PGA, and only two other golfers (one of whom is Olinger) have sued the USGA for a waiver of the walking rule. In addition, we believe petitioner's point is misplaced, as nowhere in § 12182(b)(2)(A)(ii) does Congress limit the reasonable modification requirement only to requests that are easy to evaluate.

government entities, and Title III covers discrimination by places of public accommodation. Title II is irrelevant to this case. Title I protects only "employees" of employers who have 15 or more employees, §§ 12112(a), 12111(5)(A). It does not protect independent contractors. See, *e. g., Birchem* v. *Knights of Columbus,* 116 F. 3d 310, 312–313 (CA8 1997); cf. *Nationwide Mut. Ins. Co.* v. *Darden,* 503 U. S. 318, 322–323 (1992). Respondent claimed employment discrimination under Title I, but the District Court found him to be an independent contractor rather than an employee.

Respondent also claimed protection under § 12182 of Title III. That section applies only to particular places and persons. The place must be a "place of public accommodation," and the person must be an "individual" seeking "enjoyment of the goods, services, facilities, privileges, advantages, or accommodations" of the covered place. § 12182(a). Of course a court indiscriminately invoking the "sweeping" and "expansive" purposes of the ADA, *ante,* at 675, 680, could argue that when a place of public accommodation denied *any* "individual," on the basis of his disability, *anything* that might be called a "privileg[e]," the individual has a valid Title III claim. Cf. *ante,* at 677. On such an interpretation, the employees and independent contractors of every place of public accommodation come within Title III: The employee enjoys the "privilege" of employment, the contractor the "privilege" of the contract.

For many reasons, Title III will not bear such an interpretation. The provision of Title III at issue here (§ 12182, its principal provision) is a public-accommodation law, and it is the traditional understanding of public-accommodation laws that they provide rights for *customers.* "At common law, innkeepers, smiths, and others who made profession of a public employment, were prohibited from refusing, without good reason, to serve a customer." *Hurley* v. *Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.;* 515 U. S. 557, 571 (1995) (internal quotation marks omitted). See also

*Heart of Atlanta Motel, Inc.* v. *United States,* 379 U. S. 241 (1964). This understanding is clearly reflected in the text of Title III itself. Section 12181(7) lists 12 specific types of entities that qualify as "public accommodations," with a follow-on expansion that makes it clear what the "enjoyment of the goods, services, etc.," of those entities consists of—and it plainly envisions that the person "enjoying" the "public accommodation" will be a *customer.* For example, Title III is said to cover an "auditorium" or "other place of public gathering," § 12181(7)(D). Thus, "gathering" is the distinctive enjoyment derived from an auditorium; the persons "gathering" at an auditorium are presumably covered by Title III, but those contracting to clean the auditorium are not. Title III is said to cover a "zoo" or "other place of recreation," § 12181(7)(I). The persons "recreat[ing]" at a "zoo" are presumably covered, but the animal handlers bringing in the latest panda are not. The one place where Title III specifically addresses discrimination by places of public accommodation through "contractual" arrangements, it makes clear that discrimination against the other party to the contract is not covered, but only discrimination against "clients or customers of the covered public accommodation that enters into the contractual, licensing or other arrangement." § 12182(b)(1)(A)(iv). And finally, the regulations promulgated by the Department of Justice reinforce the conclusion that Title III's protections extend only to customers. "The purpose of the ADA's public accommodations requirements," they say, "is to ensure accessibility to the goods offered by a public accommodation." 28 CFR, ch. 1, pt. 36, App. B, p. 650 (2000). Surely this has nothing to do with employees and independent contractors.

If there were any doubt left that § 12182 covers only clients and customers of places of public accommodation, it is eliminated by the fact that a contrary interpretation would make a muddle of the ADA as a whole. The words of Title III must be read "in their context and with a view to their

place in the overall statutory scheme." *Davis* v. *Michigan Dept. of Treasury*, 489 U. S. 803, 809 (1989). Congress expressly excluded employers of fewer than 15 employees from Title I. The mom-and-pop grocery store or laundromat need not worry about altering the nonpublic areas of its place of business to accommodate handicapped employees—or about the litigation that failure to do so will invite. Similarly, since independent contractors are not covered by Title I, the small business (or the large one, for that matter) need not worry about making special accommodations for the painters, electricians, and other independent workers whose services are contracted for from time to time. It is an entirely unreasonable interpretation of the statute to say that these exemptions so carefully crafted in Title I are entirely eliminated by Title III (for the many businesses that are places of public accommodation) because employees and independent contractors "enjoy" the employment and contracting that such places provide. The only *distinctive* feature of places of public accommodation is that they accommodate the *public,* and Congress could have no conceivable reason for according the employees and independent contractors of such businesses protections that employees and independent contractors of other businesses do not enjoy.

The United States apparently agrees that employee claims are not cognizable under Title III, see Brief for United States as *Amicus Curiae* 18–19, n. 17, but despite the implications of its own regulations, see 28 CFR, ch. 1, pt. 36, App. B, at 650, appears to believe (though it does not explicitly state) that claims of independent contractors are cognizable. In a discussion littered with entirely vague statements from the legislative history, cf. *ante,* at 674–675, the United States argues that Congress presumably wanted independent contractors with private entities covered under Title III because independent contractors with governmental entities are covered by Title II, see Brief for United States as *Amicus Curiae* 18, and n. 17—a line of reasoning

that does not commend itself to the untutored intellect. But since the United States does not provide (and I cannot conceive of) any possible construction of the *terms* of Title III that will exclude employees while simultaneously covering independent contractors, its concession regarding employees effectively concedes independent contractors as well. Title III applies only to customers.

The Court, for its part, assumes that conclusion for the sake of argument, *ante*, at 679–680, but pronounces respondent to be a "customer" of the PGA TOUR or of the golf courses on which it is played. That seems to me quite incredible. The PGA TOUR is a professional sporting event, staged for the entertainment of a live and TV audience, the receipts from whom (the TV audience's admission price is paid by advertisers) pay the expenses of the tour, including the cash prizes for the winning golfers. The professional golfers on the tour are no more "enjoying" (the statutory term) the entertainment that the tour provides, or the facilities of the golf courses on which it is held, than professional baseball players "enjoy" the baseball games in which they play or the facilities of Yankee Stadium. To be sure, professional ballplayers *participate* in the games, and *use* the ballfields, but no one in his right mind would think that they are *customers* of the American League or of Yankee Stadium. They are themselves the entertainment that the customers pay to watch. And professional golfers are no different. It makes not a bit of difference, insofar as their "customer" status is concerned, that the remuneration for their performance (unlike most of the remuneration for ballplayers) is not fixed but contingent—viz., the purses for the winners in the various events, and the compensation from product endorsements that consistent winners are assured. The compensation of *many* independent contractors is contingent upon their success—real estate brokers, for example, or insurance salesmen.

As the Court points out, the ADA specifically identifies golf courses as one of the covered places of public accommodation. See § 12181(7)(L) ("a gymnasium, health spa, bowling alley, golf course, or other place of exercise or recreation"); and the distinctive "goo[d], servic[e], facilit[y], privileg[e], advantag[e], or accommodatio[n]" identified by that provision as distinctive to that category of place of public accommodation is "exercise or recreation." Respondent did not seek to "exercise" or "recreate" at the PGA TOUR events; he sought to make money (which is why he is called a *professional* golfer). He was not a customer *buying* recreation or entertainment; he was a professional athlete *selling* it. That is the reason (among others) the Court's reliance upon Civil Rights Act cases like *Daniel* v. *Paul,* 395 U. S. 298 (1969), see *ante,* at 681, is misplaced. A professional golfer's practicing his profession is not comparable to John Q. Public's frequenting "a 232-acre amusement area with swimming, boating, sun bathing, picnicking, miniature golf, dancing facilities, and a snack bar." *Daniel, supra,* at 301.

The Court relies heavily upon the Q-School. It says that petitioner offers the golfing public the "privilege" of "competing in the Q-School and playing in the tours; indeed, the former is a privilege for which thousands of individuals from the general public pay, and the latter is one for which they vie." *Ante,* at 677. But the Q-School is no more a "privilege" offered for the general public's "enjoyment" than is the California Bar Exam.[1] It is a competition for entry into the PGA TOUR—an open tryout, no different in principle from open casting for a movie or stage production, or walk-on try-

---

[1] The California Bar Exam is covered by the ADA, by the way, because a separate provision of Title III applies to "examinations . . . related to applications, licensing, certification, or credentialing for secondary or post-secondary education, professional, or trade purposes." 42 U. S. C. § 12189. If open tryouts were "privileges" under § 12182, and participants in the tryouts "customers," § 12189 would have been unnecessary.

outs for other professional sports, such as baseball. See, *e. g.*, Amateurs Join Pros for New Season of HBO's "Sopranos," Detroit News, Dec. 22, 2000, p. 2 (20,000 attend open casting for "The Sopranos"); Bill Zack, Atlanta Braves, Sporting News, Feb. 6, 1995 (1,300 would-be players attended an open tryout for the Atlanta Braves). It may well be that some amateur golfers enjoy trying to make the grade, just as some amateur actors may enjoy auditions, and amateur baseball players may enjoy open tryouts (I hesitate to say that amateur lawyers may enjoy taking the California Bar Exam). But the purpose of holding those tryouts is not to provide entertainment; it is to hire. At bottom, open tryouts for performances to be held at a place of public accommodation are no different from open bidding on contracts to cut the grass at a place of public accommodation, or open applications for any job at a place of public accommodation. Those bidding, those applying—and those trying out—are not converted into customers. By the Court's reasoning, a business exists not only to sell goods and services to the public, but to provide the "privilege" of employment to the public; wherefore it follows, like night the day, that everyone who seeks a job is a customer.[2]

---

[2] The Court suggests that respondent is not an independent contractor because he "play[s] at [his] own pleasure," and is not subject to PGA TOUR control "over [his] manner of performance," *ante*, at 680, n. 33. But many independent contractors—composers of movie music, portrait artists, script writers, and even (some would say) plumbers—retain at least as much control over when and how they work as does respondent, who agrees to play in a minimum of 15 of the designated PGA TOUR events, and to play by the rules that the PGA TOUR specifies. Cf. *Community for Creative Non-Violence* v. *Reid*, 490 U. S. 730, 751–753 (1989) (discussing independent contractor status of a sculptor). Moreover, although, as the Court suggests in the same footnote, in rare cases a PGA TOUR winner will choose to forgo the prize money (in order, for example, to preserve amateur status necessary for continuing participation in college play) he is contractually *entitled* to the prize money if he demands it, which is all that a contractual relationship requires.

## II

Having erroneously held that Title III applies to the "customers" of professional golf who consist of its practitioners, the Court then erroneously answers—or to be accurate simply ignores—a second question. The ADA requires covered businesses to make such reasonable modifications of "policies, practices, or procedures" as are necessary to "afford" goods, services, and privileges to individuals with disabilities; but it explicitly does not require "modifications [that] would fundamentally alter the nature" of the goods, services, and privileges. § 12182(b)(2)(A)(ii). In other words, disabled individuals must be given *access* to the same goods, services, and privileges that others enjoy. The regulations state that Title III "does not require a public accommodation to alter its inventory to include accessible or special goods with accessibility features that are designed for, or facilitate use by, individuals with disabilities." 28 CFR § 36.307 (2000); see also 28 CFR, ch. 1, pt. 36, App. B, at 650. As one Court of Appeals has explained:

> "The common sense of the statute is that the content of the goods or services offered by a place of public accommodation is not regulated. A camera store may not refuse to sell cameras to a disabled person, but it is not required to stock cameras specially designed for such persons. Had Congress purposed to impose so enormous a burden on the retail sector of the economy and so vast a supervisory responsibility on the federal courts, we think it would have made its intention clearer and would at least have imposed some standards. It is hardly a feasible judicial function to decide whether shoestores should sell single shoes to one-legged persons and if so at what price, or how many Braille books the Borders or Barnes and Noble bookstore chains should stock in each of their stores." *Doe* v. *Mutual of Omaha Ins. Co.*, 179 F. 3d 557, 560 (CA7 1999).

Since this is so, even if respondent here is a consumer of the "privilege" of the PGA TOUR competition, see *ante*, at 677, I see no basis for considering whether the rules of that competition must be altered. It is as irrelevant to the PGA TOUR's compliance with the statute whether walking is essential to the game of golf as it is to the shoe store's compliance whether "pairness" is essential to the nature of shoes. If a shoe store wishes to sell shoes only in pairs it may; and if a golf tour (or a golf course) wishes to provide only walk-around golf, it may. The PGA TOUR cannot deny respondent *access* to that game because of his disability, but it need not provide him a game different (whether in its essentials or in its details) from that offered to everyone else.

Since it has held (or assumed) professional golfers to be customers "enjoying" the "privilege" that consists of PGA TOUR golf; and since it inexplicably regards the rules of PGA TOUR golf as merely "policies, practices, or procedures" by which access to PGA TOUR golf is provided, the Court must then confront the question whether respondent's requested modification of the supposed policy, practice, or procedure of walking would "fundamentally alter the nature" of the PGA TOUR game, § 12182(b)(2)(A)(ii). The Court attacks this "fundamental alteration" analysis by asking two questions: first, whether the "essence" or an "essential aspect" of the sport of golf has been altered; and second, whether the change, even if not essential to the game, would give the disabled player an advantage over others and thereby "fundamentally alter the character of the competition." *Ante*, at 683. It answers no to both.

Before considering the Court's answer to the first question, it is worth pointing out that the assumption which underlies that question is false. Nowhere is it writ that PGA TOUR golf must be classic "essential" golf. Why cannot the PGA TOUR, if it wishes, promote a new game, with distinctive rules (much as the American League promotes a game of baseball in which the pitcher's turn at the plate can be

taken by a "designated hitter")?    If members of the public do not like the new rules—if they feel that these rules do not truly test the individual's skill at "real golf" (or the team's skill at "real baseball") they can withdraw their patronage.    But the rules are the rules.    They are (as in all games) entirely arbitrary, and there is no basis on which anyone—not even the Supreme Court of the United States—can pronounce one or another of them to be "nonessential" if the rulemaker (here the PGA TOUR) deems it to be essential.

If one assumes, however, that the PGA TOUR has some legal obligation to play classic, Platonic golf—and if one assumes the correctness of all the other wrong turns the Court has made to get to this point—then we Justices must confront what is indeed an awesome responsibility.    It has been rendered the solemn duty of the Supreme Court of the United States, laid upon it by Congress in pursuance of the Federal Government's power "[t]o regulate Commerce with foreign Nations, and among the several States," U. S. Const., Art. I, § 8, cl. 3, to decide What Is Golf.    I am sure that the Framers of the Constitution, aware of the 1457 edict of King James II of Scotland prohibiting golf because it interfered with the practice of archery, fully expected that sooner or later the paths of golf and government, the law and the links, would once again cross, and that the judges of this august Court would some day have to wrestle with that age-old jurisprudential question, for which their years of study in the law have so well prepared them: Is someone riding around a golf course from shot to shot *really* a golfer?    The answer, we learn, is yes.    The Court ultimately concludes, and it will henceforth be the Law of the Land, that walking is not a "fundamental" aspect of golf.

Either out of humility or out of self-respect (one or the other) the Court should decline to answer this incredibly difficult and incredibly silly question.    To say that something is "essential" is ordinarily to say that it is necessary to the achievement of a certain object.    But since it is the very

nature of a game to have no object except amusement (that is what distinguishes games from productive activity), it is quite impossible to say that any of a game's arbitrary rules is "essential." Eighteen-hole golf courses, 10-foot-high basketball hoops, 90-foot baselines, 100-yard football fields—all are arbitrary and none is essential. The only support for any of them is tradition and (in more modern times) insistence by what has come to be regarded as the ruling body of the sport—both of which factors support the PGA TOUR's position in the present case. (Many, indeed, consider walking to be *the central feature* of the game of golf—hence Mark Twain's classic criticism of the sport: "a good walk spoiled.") I suppose there is some point at which the rules of a well-known game are changed to such a degree that no reasonable person would call it the same game. If the PGA TOUR competitors were required to dribble a large, inflated ball and put it through a round hoop, the game could no longer reasonably be called golf. But this criterion—destroying recognizability as the same generic game—is surely not the test of "essentialness" or "fundamentalness" that the Court applies, since it apparently thinks that merely changing the diameter of the *cup* might "fundamentally alter" the game of golf, *ante,* at 682.

Having concluded that dispensing with the walking rule would not violate federal-Platonic "golf" (and, implicitly, that it is federal-Platonic golf, and no other, that the PGA TOUR can insist upon), the Court moves on to the second part of its test: the competitive effects of waiving this nonessential rule. In this part of its analysis, the Court first finds that the effects of the change are "mitigated" by the fact that in the game of golf weather, a "lucky bounce," and "pure chance" provide different conditions for each competitor and individual ability may not "be the sole determinant of the outcome." *Ante,* at 687. I guess that is why those who follow professional golfing consider Jack Nicklaus the *luckiest* golfer of all time, only to be challenged of late by

the phenomenal *luck* of Tiger Woods. The Court's empiricism is unpersuasive. "Pure chance" is randomly distributed among the players, but allowing respondent to use a cart gives him a "lucky" break every time he plays. Pure chance also only matters at the margin—a stroke here or there; the cart substantially improves this respondent's competitive prospects beyond a couple of strokes. But even granting that there are significant nonhuman variables affecting competition, that fact does not justify adding another variable that always favors one player.

In an apparent effort to make its opinion as narrow as possible, the Court relies upon the District Court's finding that even with a cart, respondent will be at least as fatigued as everyone else. *Ante,* at 690. This, the Court says, *proves* that competition will not be affected. Far from thinking that reliance on this finding cabins the effect of today's opinion, I think it will prove to be its most expansive and destructive feature. Because step one of the Court's two-part inquiry into whether a requested change in a sport will "fundamentally alter [its] nature," § 12182(b)(2)(A)(ii), consists of an utterly unprincipled ontology of sports (pursuant to which the Court is not even sure whether golf's "essence" requires a 3-inch hole), there is every reason to think that in future cases involving requests for special treatment by would-be athletes the second step of the analysis will be determinative. In resolving that second step—determining whether waiver of the "nonessential" rule will have an impermissible "competitive effect"—by measuring the athletic capacity of the requesting individual, and asking whether the special dispensation would do no more than place him on a par (so to speak) with other competitors, the Court guarantees that future cases of this sort will have to be decided on the basis of individualized factual findings. Which means that future cases of this sort will be numerous, and a rich source of lucrative litigation. One can envision the parents of a Little

League player with attention deficit disorder trying to convince a judge that their son's disability makes it at least 25% more difficult to hit a pitched ball. (If they are successful, the only thing that could prevent a court order giving the kid four strikes would be a judicial determination that, in baseball, three strikes are metaphysically necessary, which is quite absurd.)

The statute, of course, provides no basis for this individualized analysis that is the Court's last step on a long and misguided journey. The statute seeks to assure that a disabled person's disability will not deny him *equal access* to (among other things) competitive sporting events—not that his disability will not deny him an *equal chance to win* competitive sporting events. The latter is quite impossible, since the very *nature* of competitive sport is the measurement, by uniform rules, of unevenly distributed excellence. This unequal distribution is precisely what determines the winners and losers—and artificially to "even out" that distribution, by giving one or another player exemption from a rule that emphasizes his particular weakness, is to destroy the game. That is why the "handicaps" that are customary in social games of golf—which, by adding strokes to the scores of the good players and subtracting them from scores of the bad ones, "even out" the varying abilities—are *not* used in professional golf. In the Court's world, there is one set of rules that is "fair with respect to the able-bodied" but "individualized" rules, mandated by the ADA, for "talented but disabled athletes." *Ante*, at 691. The ADA mandates no such ridiculous thing. Agility, strength, speed, balance, quickness of mind, steadiness of nerves, intensity of concentration—these talents are not evenly distributed. No wild-eyed dreamer has ever suggested that the managing bodies of the competitive sports that test precisely these qualities should try to take account of the uneven distribution of God-

given gifts when writing and enforcing the rules of competition. And I have no doubt Congress did not authorize misty-eyed judicial supervision of such a revolution.

\* \* \*

My belief that today's judgment is clearly in error should not be mistaken for a belief that the PGA TOUR clearly *ought not* allow respondent to use a golf cart. *That* is a close question, on which even those who compete in the PGA TOUR are apparently divided; but it is a *different* question from the one before the Court. Just as it is a different question whether the Little League *ought* to give disabled youngsters a fourth strike, or some other waiver from the rules that makes up for their disabilities. In both cases, whether they *ought* to do so depends upon (1) how central to the game that they have organized (and over whose rules they are the master) they deem the waived provision to be, and (2) how competitive—how strict a test of raw athletic ability in all aspects of the competition—they want their game to be. But whether Congress has said they *must* do so depends upon the answers to the legal questions I have discussed above—not upon what this Court sententiously decrees to be " 'decent, tolerant, [and] progressive,' " *ante*, at 675 (quoting *Board of Trustees of Univ. of Ala.* v. *Garrett*, 531 U. S. 356, 375 (2001) (KENNEDY, J., concurring)).

And it should not be assumed that today's decent, tolerant, and progressive judgment will, in the long run, accrue to the benefit of sports competitors with disabilities. Now that it is clear courts will review the rules of sports for "fundamentalness," organizations that value their autonomy have every incentive to defend vigorously the necessity of every regulation. They may still be second-guessed in the end as to the Platonic requirements of the sport, but they will *assuredly* lose if they have at all wavered in their enforcement. The lesson the PGA TOUR and other sports organizations should take from this case is to make sure that the same written

rules are set forth for all levels of play, and never voluntarily to grant any modifications. The second lesson is to end open tryouts. I doubt that, in the long run, even disabled athletes will be well served by these incentives that the Court has created.

Complaints about this case are not "properly directed to Congress," *ante,* at 689, n. 51. They are properly directed to this Court's Kafkaesque determination that professional sports organizations, and the fields they rent for their exhibitions, are "places of public accommodation" to the competing athletes, and the athletes themselves "customers" of the organization that pays them; its Alice in Wonderland determination that there are such things as judicially determinable "essential" and "nonessential" rules of a made-up game; and its Animal Farm determination that fairness and the ADA mean that everyone gets to play by individualized rules which will assure that no one's lack of ability (or at least no one's lack of ability so pronounced that it amounts to a disability) will be a handicap. The year was 2001, and "everybody was finally equal." K. Vonnegut, Harrison Bergeron, in Animal Farm and Related Readings 129 (1997).