Gants, J.
The plaintiff, Stephen Kuketz, has been in a wheelchair since 1991, when he became a paraplegic. He also is an accomplished athlete, having prevailed in enough wheelchair raquetball competitions to become in 1995 a nationally ranked wheelchair racquetball player. Since the fall of 1994, Kuketz has been a member of the defendant Brockton Athletic *512 Club (“the Club”). In January 1995, Kuketz asked to play In the Club’s Men’s “A” Level Tournament League (“the A League”), where the Club’s finest footed racquetball players compete against each other. However, Kuketz insisted that he be permitted two bounces to hit the ball, rather than the one bounce given to all footed players. The defendant Roslyn Petronelli, who managed the Club, refused to allow him to play in the A League, offering instead that he play in a novice league with footed players and be given only one bounce, or that she set up a wheelchair league for him if he could find other wheelchair players. Kuketz rejected these alternatives, and insisted upon being placed in the A League and given two bounces. Petronelli, on behalf of the Club, refused to allow him into the A League, and this suit followed.
Kuketz in his complaint alleges that the Club,' Petronelli, and the Club’s owner, defendant Charles “Nick" Mirrione, violated Title III of the Americans with Disabilities Act (“ADA”), 42 U.S.C. §12181, byrefusing to allow him to participate in the A League because of his disability (Count V). Kuketz further alleges that barring him from the A League because of his disability also violated G.L.c. 272, §98 and c. 15 IB by discriminating against him on the basis of his handicap in a place of public accommodation (Count I). Kuketz also claims that the defendants violated G.L.c. 272, §92 and c. 151B by posting an editorial on the Club’s bulletin board critical of Kuketz and his request to play in the A League (Count II).[1]
All parties have cross-moved for summary judgment. This Court will first consider whether summary judgment should be granted as to the federal claim of violation of the ADA, and then shall consider the state claims.
Alleged Violation of the Federal ADA
42 U.S.C. §12182(a) of the ADA provides, “No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation.” Discrimination under the ADA is further defined as “a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations." 42 U.S.C. §12182(b)(2)(A)(ii) (emphasis added). In considering whether the ADA requires modifications to permit a handicapped person to play in an athletic competition, “the statute contemplates three inquiries: whether the requested modification is ‘reasonable,’ whether it is ‘necessary’ for the disabled individual, and whether it would ‘fundamentally alter the nature of the competition.” PGA Tour, Inc. v. Martin, 121 S.Ct. 1879, 1893 n. 38 (2001).
In the context of this case, there is no dispute that, given Kuketz’s ability as a racquetball player, he would be playing in the A League if he were not a paraplegic and could play on foot. Effectively, Kuketz is claiming that, under the ADA, the Club discriminates against him on the basis of his disability if it fails to make two modifications to the usual rules in the A League: (1) he needs to play in a wheelchair, rather than on foot; and (2) he needs to be given two bounces rather than one.
There can be no dispute that both these modifications are “necessary” if Kuketz is to play in the A League: he has no mobility without his wheelchair and acknowledges that it is impossible for a wheelchair racquetball player, even one as good as him, to be competitive against a footed player if the wheelchair player must hit the ball on the first bounce. The defendants contend, however, that the modifications are not “reasonable” because they pose a safety risk to footed racquetball competitors and “fundamentally alter the nature” of the competition because they allow one player two bounces.
The record on summary judgment is not sufficient to permit this Court to find, as a matter of law, whether or not these modifications are reasonable. This Court recognizes that, of the eleven players who signed up for the A League, all eleven refused to play with Kuketz because of concerns for their safety, but the record says little as to whether the safety concerns of these potential competitors were reasonable or simply the product of ignorance and prejudice. Moreover, there are conflicting opinions in the record from those who claim expertise as racquetball players as to whether competitive play at this level between a footed and wheelchair player poses a significant risk of injury. Nor is there any empirical evidence to resolve this issue definitively.
The central issue in this case, then, is whether these modifications “fundamentally alter the nature” of the competition in racquetball. In PGA Tour, Inc. v. Martin, the Supreme Court recently considered whether the PGA Tour was required under the ADA to permit a professional golfer to use a golf cart when he was disabled with a degenerative circulatory disorder that caused atrophy to his right leg and rendered him unable to walk an 18-hole golf course. 121 S.Ct. 1879 (2001). In evaluating whether the use of a golf cart fundamentally altered the nature of the competition in professional golf, the Court recognized that there may be two types of fundamental alterations: (1) a modification “might alter such an essential aspect of the game of golf that it would be unacceptable even if it affected all competitors equally: changing the diameter of the hole from three to six inches might be such a modification . . and (2) a less significant modifi *513 cation “that has only a peripheral impact on the game itself might nevertheless give a disabled player ... an advantage over others . . .” Id. at 1893. The Supreme Court held that allowing golfer Casey Martin to ride a golf cart to his ball rather than walk the course did not “work a fundamental alteration in either sense.” Id.
In reaching this decision, the Court observed that “the essence of the game [of golf] has been shot-making — using clubs to cause a ball to progress from the teeing ground to a hole some distance away with as few strokes as possible.” Id. at 1893-94. In short, the Court found that hitting the golf ball was fundamental; how one traveled to the ball was not. The Court also observed that Martin, by using a golf cart, will not obtain an unfair advantage over non-disabled golfers who have to walk to their ball because, as a result of his disability, he will be more fatigued by simply walking from the golf cart to his ball and back than his able-bodied competitors will be from walking the course. Id. at 1897.
Relying on the analysis the Supreme Court used to determine that the use of a golf cart by Casey Martin did not fundamentally alter the nature of professional golf competition, this Court finds that the imposition of a two-bounce rule for wheelchair players who compete against footed players will fundamentally alter the nature of racquetball competition in the A League. While the essence of golf is hitting a stationary ball with a club, the essence of racquetball is hitting a moving ball before the second bounce with a racquet. Allowing one player two bounces fundamentally changes the nature of the game.
The Official Rules of Racquetball that were in effect in 1995, promulgated by the American Amateur Racquetball Association, required the ball to be returned on the first bounce; these rules, under the United States Racquetball Association, remain in effect today. Both the American. Amateur Racquetball Association and, later, the United States Racquetball Association promulgated Official Rules for wheelchair racquetball that modify the Official Rules that apply to footed players by permitting the ball to be returned on the second bounce. Implicit in these Official Rules is that, in wheelchair racquetball, both players are in wheelchairs. There is nothing in the Official Rules that speaks to what rules should be used when a footed player competes against a wheelchair player. In short, giving a wheelchair player two bounces and a footed player one bounce is a variation on the Official Rules of racquetball. The Club is certainly free to establish a league that plays this variation of racquetball but it is not required by the ADA to do so.
Even if the number of bounces a racquetball player is allowed were seen as having “only a peripheral impact on the game,” this Court finds that the imposition of a two-bounce rule for wheelchair players who compete against footed players might nevertheless give a disabled player “an advantage over others.” See id. at 1893. The reason why wheelchair players need a second bounce is that they do not have the same speed and mobility in their wheelchairs as footed players have in their legs. Kuketz wants a second bounce to offset the disadvantage he suffers from being in a wheelchair, but it is impossible to determine whether the second bounce exactly offsets that disadvantage or leaves him with a slight advantage (or disadvantage) over certain players. Stated differently, if Kuketz were allowed to compete in the A League as he requests and were to become champion of the league, no one could know whether he won because he was the superior player or because the allowance of two bounces more than offset his disadvantage in mobility.
It is worthwhile to reflect upon what the sporting world would look like if the ADA were interpreted as Kuketz proposes. In baseball, if a hitter in a wheelchair came to the plate, the ADA would require first base to be moved closer to home plate so that the hitter could reach first base in roughly the time it would take a footed player to run ninety feet. In golf tournaments, the ADA would require “wheelchair tees” closer to the hole to compensate for the shorter distances that wheelchair golfers can generally hit their tee shot. In basketball, the ADA would require that wheelchair teams competing against footed teams be given a shorter basket to compensate for their greater difficulty in shooting a basketball without the use of their legs. It maybe terrific for leagues and clubs to provide these opportunities so that wheelchair players can compete meaningfully against footed players, but the ADA does not require them to depart from the official rules whenever a wheelchair player or team wants to play a footed player or team. The law permits leagues and clubs to organize baseball, golf, and basketball leagues that play their respective games in accordance with the game’s official rules without running afoul of the ADA.
This Court concludes that the Club is not required under the ADA to depart from the Official Rules of racquetball to permit a wheelchair player two bounces so that he may compete in tournament play against the Club’s best footed players, because such a modification would fundamentally alter the nature of the racquetball competition. The defendants’ motion for summary judgment as to the ADA claim — Count V — is, therefore, ALLOWED.
Alleged Violation of State Handicap Discrimination Laws
G.L.c. 272, §98 prohibits making “any distinction, discrimination or restriction on account of . . . physical or mental disability . . . relative to the admission of any person to, or his treatment in any place of public accommodation, resort or amusement. . ,”[2] It further provides, “All persons shall have the right to the full and equal accommodations, advantages, facilities and privileges of any place of public accommodation, resort *514 or amusement subject only to the conditions and limitations established by law and applicable to all persons.” Id.
Interpretation of this statute has proceeded “hand in hand” with the interpretation of the ADA. Lesley v. Chie, 81 F.Sup.2d 217, 226 (D.Mass. 2000). This Court sees no good reason why this statute would provide for a different result with respect to Kuketz’s claim than would the ADA. Therefore, the defendants’ motion for summary judgment is ALLOWED as to the claims directly or derivatively based on this state statute — Counts I, III, and IV.
Alleged Retaliation for Kuketz’s Exercise of His Civil Rights
In Count II, Kuketz alleges that the defendants retaliated against him for complaining about what he' understood to be a deprivation of his civil rights as a handicapped person. The fact that Kuketz has been determined by this Court not to have the civil right he claimed does not, by itself, mean that his retaliation claim must fail. See, e.g., Bain v. Springfield, 424 Mass. 758 (1997). Rather, his retaliation claim must fail because, viewed in the light most favorable to him, it falls short of stating a claim of retaliation under G.L.c. 15 IB, §4(4).[3]
The retaliation alleged by Kuketz is that the defendants permitted' a Letter to the Editor published in the Brockton Enterprise criticizing Kuketz’s claims of handicap discrimination to be posted at the Club. Allowing such a Letter to the Editor to be posted (indeed, even posting it oneself) cannot as a matter of law, standing alone, constitute retaliation in violation of G.L.c. 15IB, §4(4). Freedom of speech means that a person accused of discrimination is permitted to defend herself from such an allegation, and communicate to others her position that she did not engage in improper conduct. See Bain v. Springfield, 424 Mass. 758, 766 (1997) (“What we most emphatically cannot countenance as an instance of retaliation is the mayor’s response in the local newspaper to the charges against him”). Here, the defendants, at most, are accused of having posted a Letter to the Editor written by another Club member that defended their conduct and challenged Kuketz’s contention that he was a victim of handicap discrimination. This Letter is purely a statement of opinion; there is nothing defamatory within it. See id. Since it would not be illegal retaliation if the defendants had themselves written and posted this defense of their conduct, it certainly cannot be illegal retaliation for them to permit a defense written by a third person to be posted within the Club. Therefore, the defendants’ motion for summary judgment is ALLOWED as to Count II.
ORDER
For the reasons stated above, the defendants’ motion for summary judgment is ALLOWED and the plaintiffs cross motion for summary judgment is DENIED. A judgment shall enter in favor of the defendants, with statutory costs assessed to the plaintiff.

 In Counts III and IV, Kuketz alleges that the defendants interfered with his exercise of the rights he enjoys as a handicapped person under G.L.c. 151B and aided others in depriving him of these rights. Count VI, alleging a violation of G.L.c. 12, §11I-H, was dismissed by Judge Richard Chin of this Court in an Order dated August 10, 1998 [9 Mass. L. Rptr. 261).

 There is no dispute that the Club is a place of public accommodation as defined under the statute.

 G.L.c. 15 IB, §4(4) bars retaliation against any person because “he has opposed any practices forbidden under this chapter or because he has filed a complaint, testified or assisted in any proceeding under [G.L.c. 15IB, §51.” For purposes of this motion, this Court will assume that this prohibition against retaliation applies to retaliatory action taken against someone who opposes or complains about discrimination in public accommodations in violation of G.L.c. 272, §98.