Gina **BAUER** and Suzanne Stolz, Plaintiffs,

v.

**MUSCULAR DYSTROPHY ASSOCIATION, INC.,**
Defendant.

No. 03–1133–WEB.

United States District Court,
D. Kansas.

June 9, 2003.

David P. Calvert, Wichita, KS, for Plaintiffs.

Jill A. Morris, Armstrong Teasdale LLP, St. Louis, MO, for Defendant.

## MEMORANDUM AND ORDER

WESLEY E. BROWN, Senior District Judge.

Plaintiffs Gina Bauer and Suzanne Stolz filed this action under the Americans with Disabilities Act (the "ADA"),[1] claiming the defendant Muscular Dystrophy Association ("MDA") is unlawfully discriminating against them on the basis of a disability. The claim arises out of a one-week summer camp run by MDA for the benefit of children with muscular dystrophy. The camp is sponsored by the Wichita District of the MDA and takes place at a facility known as Camp Chihowa near Perry, Kansas. MDA leases the camp for one week each year and operates it with members of MDA's staff and a sizeable contingent of volunteers or "camp counselors." The camp serves about 35–40 young campers each session. The plaintiffs, both of whom have disabilities due to muscular dystrophy, allege that they have served as camp counselors for MDA in the past but that MDA will not allow them to do so this year because of an MDA policy requiring all volunteers to be able "to lift and care for a camper." In this lawsuit, plaintiffs claim that the MDA Summer Camp is a "place of public accommodation" subject to Title III of the ADA and that the MDA's policy discriminates against them on the basis of their disability to prevent them from enjoying the services, facilities, privileges, and advantages of a public accommodation in violation of Title III. Plaintiffs seek injunctive relief requiring the defendant to change its policy and to permit them to serve as camp counselors for the 2003 camp session. They also seek attorneys fees and litigation expenses.

The matter came before the court on May 13–14, 2003, for a hearing on plain-

---

1. 42 U.S.C. § 12101 *et seq.* The claim is also asserted under a similar provision of the Kansas Act Against Discrimination ("KAAD"), K.S.A. § 44–1001 *et seq.*

tiffs' motion for a preliminary injunction. At the conclusion of the hearing, the parties agreed that no further discovery or evidence was needed and that the court could issue a final ruling on the merits from the evidence presented at the May 13–14 hearing. *See Fed.R.Civ.P.* 65(a) (court may consolidate trial on the merits with the hearing for preliminary injunction). The parties subsequently submitted proposed findings of fact and conclusions of law. The court has now reviewed the materials submitted by the parties and is prepared to rule. Accordingly, the following findings of fact and conclusions of law constitute a final ruling on the merits of the case.

## I. *Facts.*

The plaintiffs are persons with disabilities as defined by the ADA. Gina Bauer has Muscular Dystrophy and uses a power wheelchair. She is substantially limited in the major life activity of walking. *Cf.* 42 U.S.C. § 12102(2) ("disability" under the ADA includes a physical impairment that substantially limits one or more major life activities). She is a substitute teacher for Unified School District 259 in Wichita, grades K–12. Suzanne Stolz has Muscular Dystrophy and sometimes uses a power wheelchair. She is substantially limited in the major life activity of walking. She is a teacher who lives in California.

The MDA is a corporation organized under the laws of New York and is registered in Kansas. MDA is the leading not-for-profit national health organization dedicated to finding the causes of, and cures and treatments for, over forty neuromuscular diseases. As part of its mission, MDA sponsors Summer Camps throughout the United States and Puerto Rico. The camps are designed to provide recreational opportunities for young campers, ages 6 through 21, with neuromuscular diseases.

MDA generally sponsors about 90 camp sessions at locations throughout the country each summer. The camps serve approximately 4200 campers each year. Each camp session is sponsored by a different local or regional MDA District.

MDA is a centralized organization, with a national office that sets policies for chapters nationwide. Local chapters are not independently operated; they are subject to the supervision of the national office. The Wichita District (also referred to as the Ark Valley Chapter) of the MDA sponsors a one week summer camp each year at Camp Chihowa near Perry, Kansas. The camp is not owned by the MDA. MDA leases the camp for the one week session.

Camp Chihowa is located on 35 acres. It includes a 4.5 acre lake for fishing and boating and 15 wooded acres. The facilities at the camp include a Main Lodge with a dormitory wing that sleeps 75–100 persons, as well as two motel-type cabins and two dorm-type cabins that each sleep 8 persons. There is an additional Lodge with a sleeping capacity of 44. Total capacity of the camp is about 180 persons. The Main Lodge contains a dining room where meals are served to campers and volunteers, and a meeting room that accommodates up to 250 people. The camp also has various recreational facilities, including a baseball diamond, basketball and volleyball courts, and a swimming pool. All of the facilities at the camp are fully handicap-accessible.

The purpose of MDA's Summer Camp Program is to provide a safe and fun week of recreation for children with muscular dystrophy. Attending the camp permits children with neuromuscular diseases to do things they might not ordinarily get to do, such socializing with other children who face similar challenges and taking part in various recreational activities with their fellow campers.

MDA's Summer Camp Program is not open to the general public. To be eligible to attend as a camper, individuals must be between the ages of 6–21, must have a neuromuscular disease that comes within the MDA's purview, and must be registered with the local chapter.

Physical Demands of Campers.

MDA presented various evidence concerning the physical needs of campers attending MDA summer camps. According to Arthur Dick, M.D., a Board Certified neurologist and Director of MDA's clinics at the University of Kansas, neuromuscular diseases result in a progressive weakening of voluntary muscles. Individuals affected by such diseases may experience a variety of symptoms, including a loss of "motor power." Some require respiratory assistance and need help with daily living activities. Individuals affected by neuromuscular disease may exhibit a wide range of observable symptoms, from virtually nothing to nearly everything.

Many of the children who attend MDA camps use wheelchairs some or all of the time. These campers typically need help transferring, eating, getting in and out of bed, showering, and using the restroom. People who help them must be physically able to do assist with these tasks and must be temperamentally suited to the job. Although there are some campers at each session who are largely self-sufficient, all of the children who attend camp generally require some physical assistance and/or close supervision and care, regardless of whether or not they use a wheelchair. Many campers have severe respiratory problems. There are significant hills at Camp Chihowa, and campers who are ambulatory, including those who use leg braces or crutches, may be fine early in the day but may become fatigued later on. Individuals with neuromuscular disease tend to fatigue more easily than able-bodied persons. They may be vulnerable to falling, which is a particular danger because they may be unable to protect themselves in the event of a fall. They also may be at risk for bone fractures because of low bone density.

MDA's Selection Criteria for Volunteer Counselors.

MDA categorizes individuals in attendance at MDA Summer Camps into three groups: Young Campers, Adult Volunteer Counselors, and MDA paid staff.

MDA's paid staff includes the Camp Director and a few others, such as kitchen staff or cooks. MDA arranges for a volunteer medical staff to be at the camp. The medical staff at the Wichita District MDA camp typically includes a physician and one or more nurses.

MDA solicits individuals to become Volunteers Counselors to assist with its Summer Camp programs. MDA policy requires that Volunteer Counselors be at least 16 years of age and "of sufficient size and strength to assist with the needs of campers." Stated otherwise, MDA requires that volunteers be able "to lift and care for campers." MDA has had such a policy at the national level for at least 12 years, although the Wichita staff who ran the camp in the past were apparently unaware of the policy. There are other eligibility criteria as well. MDA requires volunteer candidates to complete an extensive application form and to undergo a medical health examination. MDA policy states that Counselors should be residents of the MDA district represented at the camp. MDA prohibits volunteers from serving at multiple camp locations in the same year. MDA obtains criminal background checks, checks references, and conducts interviews to determine if candidates are suitable for the position. Volunteers who are under the age of 18 must obtain consent from a parent or guardian to serve at the camp. MDA officials exercise discretion in select-

ing suitable individuals to work as counselors. Volunteers perform tasks under the direction and control of MDA staff. Volunteers will be sent home by MDA if they fail to follow directions or the rules of the camp. Volunteer Counselors receive no pay for working at the camp; they are provided with room and board by MDA during the camp.

MDA has developed its policies and risk assessment plans at the national level. Marianne Clark is the Associate Director of Health Care Services for MDA and the national director for MDA's Summer Camp Program. Ms. Clark testified concerning considerations that went into MDA's policies on selection of Volunteer Counselors. MDA initially relies upon standards promulgated by the American Camping Association (ACA), as well as assistance from risk management advisors, insurance personnel, and legal counsel. Ms. Clark is a member of the American Camping Association and has attended several conferences of the ACA. MDA is not an expert in the area of camps, and so it relies upon ACA standards as a benchmark of appropriate conduct. A publication of the ACA providing a sample of the essential functions of a Camp Counselor states in part that a counselor should "be able to assist campers in emergency (fire, injury, etc.); . . . and possess strength and endurance required to maintain constant supervision of campers." Ms. Clark testified that MDA is required to plan for all possible hazards and emergencies in connection with its Summer Camps. Potential hazards include fire, severe weather, floods, medical emergencies, and injuries. At least four campers have died while at MDA Summer Camps and four more have died after being taken to the hospital during camp sessions. MDA has had to rush campers to the hospital as a result of medical emergencies, including breathing problems, falls by children, and children in wheelchairs overturning.

MDA considers it an essential function for Volunteer Counselors to be able to lift and care for campers on a regular basis and in the event of an emergency. The duties of Volunteer Counselors include regularly manually lifting and transferring campers to and from wheelchairs, beds, showers and toilets, and assisting them with their normal daily activities. They also regularly accompany campers throughout the camp, push wheelchairs and monitor and assist campers in whatever needs arise, and help campers participate in recreational activities they might not ordinarily get to do such as swimming and horse back riding. Some campers bring vitally necessary durable medical equipment to camp, such as breathing machines, lung vibrators, wheelchairs, charging station machines, and generators. A significant function of Volunteer Counselors is aiding campers in the safe and proper use of such equipment. Counselors may be expected to help campers with packing and unpacking items and with certain cleaning chores. Volunteer Counselors are expected to help evacuate campers in the event of a medical or other emergency. In the past at Camp Chihowa there have been tornado warnings, blackouts and flooding that required Volunteer Counselors to evacuate campers and to assist them in taking cover and in meeting their medical needs without electricity. There have also been medical emergencies at Camp Chihowa in the past that required the physical intercession of Volunteer Counselors. Although such emergencies are infrequent, they can and do occur. As the defendant notes, emergencies are a reasonably foreseeable occurrence at the camp. It is impossible to foresee with precision what situations may arise, and MDA must be prepared to provide for the safety of the campers in any conceivable situation.

MDA's policy does not prohibit an individual with a disability from serving as a Volunteer Counselor so long as the individual is able to lift and care for a camper. MDA has Volunteer Counselors who have neuromuscular diseases and other disabilities yet who are still capable of meeting this requirement.

At camp sessions, each camper is typically assigned a one-on-one Volunteer Counselor (sometimes called an "attendant") whose responsibility it is to provide assistance to the camper on a 24–hour basis. On top of that, there are a number of additional Volunteer Counselors who "float" and fill in where needed and who also have additional duties, such as helping at the "snack shack," serving as lifeguards, and planning and conducting sporting activities and crafts. If a Volunteer Counselor is unable to perform a job, needs a break, becomes ill, or is sent home for some reason, one of the additional Volunteer Counselors at the camp is expected to step in and take the place of that counselor. The additional Volunteer Counselors may be called upon to assist the one-on-one attendants. A number of campers require two and sometimes three persons to lift or transfer them. Some Volunteer Counselors, usually experienced ones, are designated as "unit leaders" or "senior counselors" and are given supervisory responsibilities in addition to the other duties of a Volunteer Counselor. Some Counselors may be designated as "activity coordinators" and given additional duties such as planning and assisting with activities such as sports, crafts, or swimming. All of the foregoing duties are performed by Volunteer Counselors, and any of the counselors may be called upon to physically assist campers with various activities.

The plaintiffs are not able to physically lift or care for campers, and would be unable to help evacuate campers in the event of an emergency. The plaintiffs might require assistance themselves in an emergency.

Plaintiffs' Attendance at Camp Chihowa.

Plaintiffs Gina Bauer and Suzanne Stolz both attended the Wichita MDA Camp Chihowa as campers from 1981 through 1994.

MDA's former Wichita District Camp Director, Barb Feese, allowed the plaintiffs to serve as Volunteer Counselors after 1994. Ms. Feese apparently did not realize that doing so was contrary to MDA's policy requiring that all Volunteer Counselors be able to lift and care for campers. Between 1995 and 2000, Ms. Bauer and Ms. Stolz attended the camp as Volunteer Counselors and performed the supervisory or planning duties of a Unit Leader and/or Senior Counselor. Ms. Stolz also acted as Sports Director during one session.

In 2001, Kim Dinell became the Wichita District Camp Director. She relied heavily on Gina Bauer for assistance in organizing and planning the camp that year. In 2001, a 20 year-old able-bodied camper requested that Gina be allowed to serve as her attendant, and Ms. Bauer was allowed to do so. In 2002, Ms. Bauer and Ms. Stolz acted as Newspaper/Yearbook Co–Directors at the camp.

Ms. Bauer has received respiratory treatments at camp while she served as a Volunteer Counselor, and MDA was responsible for providing such treatments to her. She also required assistance from other Volunteer Counselors in the morning and the evening. She required assistance getting in and out of the pool, and assistance with her food tray and when using the restroom.

In September of 2002, Kim Dinell told Ms. Bauer that she could not be a Volunteer Counselor at the Wichita District Summer Camp session in 2003 due to the MDA's policy requiring volunteers to be

able to lift and care for campers. For 2003, MDA has added a question to its volunteer application form asking whether the applicant is able to lift and care for a camper. Ms. Stolz' mother obtained a Volunteer Counselor application for 2003. Neither Gina Bauer nor Suzanne Stolz has actually submitted an application to be a counselor at the 2003 session of camp, but the court rejects MDA's suggestion that this fact bars the plaintiffs' claim. The evidence shows that MDA has conveyed to the plaintiffs that they would not be considered for the position of Volunteer Counselor even if they submitted an application because they do not meet the requirement of being able to lift and care for a camper.

The Wichita MDA offered Ms. Bauer the opportunity to participate in the pre-camp planning stages of the 2003 session of Summer Camp, but she indicated she would not help if she could not be a counselor at the camp.

MDA seeks to have on average about 10 additional volunteers at each camp over and above the volunteers that are paired one-on-one with campers. Limiting the number of volunteers helps to ensure that the focus of the camp remains on the campers and not on the volunteers. It also helps to conserve MDA's financial and other resources.

In the past the Wichita MDA Camp has had significantly more Volunteer Counselors than were necessary to operate the camp safely and efficiently. At the 2002 Wichita session at Camp Chihowa, there were approximately 40 campers and 70 volunteers. Nancy Inwood, who is District Director for the Wichita District MDA and whose duties include supervising the Camp Director, testified that she attended the Wichita session at Camp Chihowa in 2002. She concluded there were too many volunteers at the camp and that many volunteers were simply "milling around" without any particular duties. She believes the MDA should re-orient the focus of the camp on the campers and should use its resources more efficiently by reducing the number of volunteers and by having them perform multiple duties. While she was at the camp in 2002, Ms. Inwood noticed Ms. Bauer and Ms. Stolz. It appeared to her that the plaintiffs' duties on the newspaper and yearbook took little time and that the plaintiffs spent a great deal of time doing other things. She saw Ms. Bauer swimming while the campers were taking a break and noticed that she required a lot of assistance, including two or three people to help her in and out of the pool and one to hold her while swimming. Julie Slack, a Health Care Services Coordinator for MDA and the assistant camp director for the Wichita MDA Camp (as well as camp director for the Shawnee Mission MDA Camp), echoed this sentiment. She observed that Ms. Bauer worked on the yearbook for an hour or two a day and then spent the rest of the time hanging out. The Wichita MDA received complaints from at least two campers who said they did not intend to return if the plaintiffs are allowed to return because they felt the camp had become too "volunteer-oriented" rather than "camper-oriented."

MDA's Wichita District has approximately 140 eligible children who could attend camp, but only 35–40 have attended camp in the past. The District plans to have an active camper recruitment program to increase camper participation. Additionally, Shawnee Mission's MDA camp, which also utilizes Camp Chihowa, is at full capacity and has been growing by 8–10 campers per year. Next year the Shawnee Mission camp expects to be over capacity and will likely shift some of its campers to Wichita's camp session at Camp Chihowa. For the 2003 session, Wichita MDA anticipates having about 45 campers and 55 Volunteer Counselors. This ratio of volunteers-to-campers would

be consistent with the MDA national average.

One result of having had a disproportionate number of volunteers in the past at the Wichita MDA camp was to divert attention and resources away from the campers and to the volunteers. This is contrary to the fundamental purpose of the camp, which is to provide recreational opportunities for the campers.

At the 2002 session of camp, the plaintiffs helped to write the camp newspaper and yearbook. For 2003, in order to encourage camper participation and interest, the Wichita District has decided to delegate the responsibility of writing these materials to the campers themselves. The District has also decided to have the additional ten or so volunteers act as a team in organizing and conducting camp activities.

The cost to MDA of operating the Wichita District session at Camp Chihowa in 2002 was about $20,000, or approximately $520 per camper. (This figure includes the costs associated with volunteers.) The Wichita District figure is within the national standard of $525 per camper to which MDA tries to adhere. Volunteers and campers are not charged for the camp; all costs are paid by MDA. MDA purchases and brings its own food for the camp session. MDA incurs additional costs as well, including insurance and staff time. MDA employees are covered by workers' compensation insurance, while campers and volunteers are covered by MDA's liability insurance.

MDA recognizes that providing examples of successful adults with neuromuscular disease to children at the camp is important. MDA welcomes adult volunteers with expertise in a particular area to apply and participate in the camp as "One Day Special Activity Guests." Individuals who are not capable of lifting and caring for campers can and do serve in this role. The Wichita District invited an individual with neuromuscular disease to teach a tennis clinic this summer as a one day special activity guest, but he was unable to attend because of a conflict in his schedule.

MDA has other opportunities besides the Summer Camps in which adults can participate and mentor others, including support groups, educational seminars, fund-raisers, and district committees.

Volunteers are a vitally important part of the MDA Summer Camps. Their assistance allows MDA to continue operating the camps, and the evidence suggests that volunteers usually find the experience highly rewarding. Volunteer Counselors generally form a strong bond with children at the camp and obtain a great sense of satisfaction from assisting them and seeing them overcome obstacles and have the type of fun other children may take for granted. But the camps are not operated for the purpose of providing benefits, privileges, or advantages to the volunteers. As noted previously, the fundamental purpose of MDA's Summer Camp Program is to provide a safe and fun week of recreation for children with muscular dystrophy. A secondary purpose is to provide a brief respite for parents of children who attend the camps. Many children with neuromuscular disease require nearly constant supervision or care, and the camp session may give parents a chance to relax for a short period while their children enjoy the camp. It would be difficult for many parents to send their children to camp, however, without an assurance from MDA that its staff and volunteers are capable of assuming the duties that the parents usually perform, including the physical demands of caring for the children. While children are at camp, the MDA stands *in loco parentis* (in the place of a parent) and is responsible for seeing that the safety of the children is assured. Given the nature of the camp, the physical needs of the

campers who attend, and the responsibility MDA assumes by conducting the camp, MDA has a compelling interest in assuring the safety of the children. Under the circumstances, the court concludes that MDA has shown that its policy requiring that all Volunteer Counselors at the camp be physically able to lift and care for the campers entrusted to MDA's care is necessary to provide for the services, facilities, privileges, advantages and accommodations offered by MDA to its campers. The court further concludes that the plaintiffs' requested modification of the MDA policy to allow them to serve as Volunteer Counselors would not be a reasonable modification of MDA's policies, that it would impose an undue hardship on the defendant in terms of costs and administrative responsibilities, and that it would fundamentally alter the nature of the services provided by MDA to the campers.

## II. *Conclusions of Law and Discussion.*

Congress enacted the ADA in 1990 to remedy widespread discrimination against disabled individuals. *PGA Tour, Inc. v. Martin,* 532 U.S. 661, 674, 121 S.Ct. 1879, 149 L.Ed.2d 904 (2001). To effectuate its sweeping purpose, the ADA forbids discrimination against disabled individuals in major areas of public life, including employment (Title I of the Act), public services (Title II), and public accommodations (Title III). *Id.* at 675, 121 S.Ct. 1879. The plaintiffs' claim in the instant case is asserted under Title III.

 Title III of the ADA states as a "[g]eneral rule":

"No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation."

42 U.S.C. § 12182(a). The phrase "public accommodation" is defined in terms of 12 extensive categories of facilities leased or operated by private entities "if the operations of such entities affect commerce." The facilities covered are:

(A) an inn, hotel, motel, or other place of lodging, except for an establishment located within a building that contains not more than five rooms for rent or hire and that is actually occupied by the proprietor of such establishment as the residence of such proprietor;

(B) a restaurant, bar, or other establishment serving food or drink;

(C) a motion picture house, theater, concert hall, stadium, or other place of exhibition or entertainment;

(D) an auditorium, convention center, lecture hall, or other place of public gathering;

(E) a bakery, grocery store, clothing store, hardware store, shopping center, or other sales or rental establishment;

(F) a laundromat, dry-cleaner, bank, barber shop, beauty shop, travel service, shoe repair service, funeral parlor, gas station, office of an accountant or lawyer, pharmacy, insurance office, professional office of a health care provider, hospital, or other service establishment;

(G) a terminal, depot, or other station used for specified public transportation;

(H) a museum, library, gallery, or other place of display or collection;

(I) a park, zoo, amusement park, or other place of recreation;

(J) a nursery, elementary, secondary, undergraduate, or postgraduate private school, or other place of education;

(K) a day care center, senior citizen center, homeless shelter, food bank, adoption agency, or other social service center establishment; and

(L) a gymnasium, health spa, bowling alley, golf course, or other place of exercise or recreation.

42 U.S.C. § 12181(7). These categories are to be construed liberally to afford people with disabilities equal access to the wide variety of establishments available to the non-disabled. *PGA Tour*, 532 U.S. at 666–67, 121 S.Ct. 1879.

Subsection (b)(1) of § 12182 elaborates on the general rule against discrimination in § 12181(a). It states that it shall be discriminatory to deny an opportunity for individuals with disabilities to participate in or benefit from the goods and services (et cetera) of the accommodation, or to create unequal goods and services or separate goods and services (unless necessary to provide such goods and services) for individuals with disabilities. Section 12182(b)(2) further explains that for purposes of the previously stated general rule, "discrimination" includes:

(i) the imposition or application of eligibility criteria that screen out or tend to screen out an individual with a disability . . . from fully and equally enjoying any goods, services, facilities, privileges, advantages, or accommodations, unless such criteria can be shown to be necessary for the provision of the goods, services, facilities, privileges, advantages, or accommodations being offered;

(ii) a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations; [and]

(iii) a failure to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services, unless the entity can demonstrate that taking such steps would fundamentally alter the nature of the good, service, facility, privilege, advantage, or accommodation being offered or would result in an undue burden; . . .

Plaintiffs argue that Wichita District's MDA Summer Camp falls within several of the categories of public accommodations listed in the statute, including a "place of lodging," an "establishment serving food or drink," a "place of public gathering," and a "place of exercise or recreation." Plaintiffs further argue that the MDA is preventing them, on the basis of a disability, from enjoying the goods, services, facilities, privileges, advantages, and accommodations of the Summer Camp. They argue that MDA has violated subsection (b)(2) above by adopting eligibility criteria that screen out persons with disabilities from enjoying the privileges and advantages, etc., offered at the camp, and by failing to take such steps or make reasonable modifications to its policies and practices that are necessary to afford such benefits to persons with disabilities, all without showing that such criteria are necessary for the operation of the camp or that making reasonable modifications would fundamentally alter the nature of the privileges offered at the camp.

■ As the court noted previously in this case, plaintiffs' complaint about being prevented from working as volunteers at the camp more closely resembles an employment situation of the type addressed by Title I of the ADA than it does the typical denial of services or privileges at a place of public accommodation addressed in Title III. After considering the framework of the ADA in light of the particular

claims and the evidence in this case, the court concludes that the plaintiffs are not individuals who have been denied the "enjoyment" of the "goods, services, facilities, privileges, advantages, or accommodations" of a place of public accommodation within the meaning of Title III of the ADA.[2] Even assuming that Wichita District's MDA Summer Camp can be classified as a place of public accommodation, the right of equal access to the "goods, services, facilities," et cetera, guaranteed by Title III is most reasonably construed to mean the goods, services and facilities *offered to customers or patrons* of the public accommodation, not to individuals who work at the facility, whether those workers be paid employees, independent contractors, or unpaid volunteers.

This conclusion is supported by the Supreme Court's discussion of Title III in *PGA Tour, Inc. v. Martin, supra.* In *Martin,* the plaintiff was a professional golfer who had a disability that limited his ability to walk. He alleged that he was being denied a privilege of a public accommodation—specifically, the privilege of participating in a golf tournament—because the PGA Tour would not modify its rules to permit him to use a golf cart. The PGA Tour asserted that plaintiff was not a member of the class protected by Title III because Title III was concerned with discrimination against clients and customers seeking to obtain goods and services from places of public accommodation, whereas golfers competing in PGA events merely provided entertainment to the viewing public, who were the Tour's actual clients and customers. 532 U.S. at 678, 121 S.Ct. 1879. The PGA argued that plaintiff's claim was "job related" and was therefore covered, if at all, by Title I dealing with employment discrimination. The majority in *Martin* did not expressly decide whether Title III's coverage was in fact limited to clients or customers of public accommodations, because it found that even if this interpretation was correct it was appropriate to classify plaintiff as the Tour's "client or customer." *Id.* at 679–80, 121 S.Ct. 1879. The majority found that the PGA offered "at least two 'privileges' to the public—that of watching the golf competition and that of competing in it." *Id.* Although the latter privilege was more difficult and expensive to obtain than the former, the Court said, "it is nonetheless a privilege that petitioner makes available to members of the general public." *Id.* In dissent, Justice Scalia noted that the traditional understanding of public accommodations laws was that they provided rights for *customers,* and he asserted that the language and structure of the ADA suggested Title III was not intended to cover individuals who work at places of public accommodation. He observed that the statute protects the right to "enjoyment" of various goods, services, et cet., which plainly envisions that the person "enjoying" the accommodation will be a customer. He noted that Title III covers an auditorium or "other place of public gathering." Thus, " 'gathering' is the distinctive enjoyment derived from an auditorium; the persons 'gathering' at an auditorium are presumably covered by Title III, but those contracting to clean the auditorium are not." *Id.* at 693, 121 S.Ct.

2. Neither party's proposed findings appear to address how the operations of the Wichita MDA Summer Camp affect commerce. *See* 42 U.S.C. § 12181(7). This is somewhat troubling given the lack of evidence showing that this camp has some specific connection to interstate commerce. Because the cumulative effects of an activity can sometimes satisfy the interstate commerce requirement, however, the court will assume for purposes of this opinion that the interstate commerce element of the statute is satisfied. *Cf. Heart of Atlanta Motel, Inc. v. United States,* 379 U.S. 241, 258, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964) (racial discrimination by local motels burdened interstate commerce).

1879. He argued that the majority's broad construction of the "customers" and "privileges" covered by Title III would mean that employees and independent contractors of every place of public accommodation would come within Title III's coverage because "[t]he employee enjoys the 'privilege' of employment, the contractor the 'privilege' of the contract." Significantly, the majority opinion did not reject Justice Scalia's premise that individuals who work at places of public accommodations are outside the scope of Title III's coverage. Rather, the Court reiterated that the plaintiff was a customer of the PGA Tour rather than an applicant for a job:

> Contrary to the dissent's suggestion, our view of the Q–School [Qualifying School] does not make "everyone who seeks a job" at a public accommodation, through "an open tryout" or otherwise, "a customer." Post, at 1901 (opinion of SCALIA, J.). Unlike those who successfully apply for a job at a place of public accommodation, or those who successfully bid for a contract, the golfers who qualify for petitioner's tours play at their own pleasure (perhaps, but not necessarily, for prize money), and although they commit to playing in at least 15 tournaments, they are not bound by any obligations typically associated with employment. See, e.g., App. 260 (trial testimony of PGA commissioner Timothy Finchem) (petitioner lacks control over when and where tour members compete, and over their manner of performance outside the rules of competition).

*Id.* at 680, n. 33, 121 S.Ct. 1879.

The foregoing discussion implies that individuals who work at places of public accommodation, and who would perform tasks for and under the direction and control of an owner or operator of a public accommodation, are not "clients or customers" of the public accommodation. Furthermore, while the *Martin* Court did not expressly find that the "privileges" guaranteed by Title III meant only those privileges offered to customers or patrons of the public accommodation, the Court certainly implied as much by its disposition of the plaintiff's claim. At any rate, the court concludes that such a limitation on the scope of Title III is properly inferred from the language of the statute, whose ambiguous terms should be construed consistently with the historical understanding of public accommodation laws. *Cf. Martin,* 532 U.S. at 693, 121 S.Ct. 1879 (Scalia, J. dissenting) (at common law, certain professions were prohibited from refusing, without good reason, to serve a customer). *See also* 42 U.S.C. § 2000a(a) (Civil Rights Act of 1964, from which ADA public accommodation provisions are derived, defining public accommodation in terms of establishment *that serves the public* ). *See also id. at subsection(e)* (exemption for a private club or other establishment not in fact open to the public, except to the extent that the facilities of such establishment are made available to the *customers or patrons* of an establishment within the scope of the law) (emphasis added). This construction is also implied by the structure of the ADA, including the respective subjects dealt with in Title I and Title III. Expanding Title III's coverage by applying it to individuals who perform work on behalf of a place of public accommodation would largely obliterate the framework of Title I—including the exceptions and exemptions from coverage embodied in Title I.[3] As the court noted in *Menkowitz v. Pottstown Memorial Med. Center,* 154 F.3d 113, 118–19 (3rd Cir.1998):

---

**3.** Plaintiffs do not claim that the defendant violated Title I. Accordingly, the court expresses no opinion as to whether plaintiffs could state a claim for relief under that Title.

[I]t is evident that Congress sought to regulate disability discrimination in the area of employment exclusively through Title I, notwithstanding the broad language of Title III. As the Senate report makes clear, "Title III is not intended to govern any terms or conditions of employment by providers of public accommodations or potential places of employment; employment practices are governed by [T]itle I of this legislation." [citations omitted].[4]

The selection of appropriate candidates for the position of Volunteer Counselor at MDA Summer Camps is essentially a matter of agency. It involves the selection of suitable individuals to perform tasks on MDA's behalf and under its direction and control. Although such individuals do not have a contract of employment with MDA, and therefore might not be characterized as employees, they are undoubtedly subject to some fiduciary duties and other obligations typically associated with employment. MDA may be legally responsible for the conduct of such volunteers when they perform tasks on behalf of MDA. Under such circumstances, the plaintiffs cannot be characterized as customers, guests or patrons of the MDA Summer Camp. They seek to be volunteer workers at the camp. Title III was simply not designed to apply to such a situation. It was designed to ensure that customers or patrons who seek the services, privileges, and advantages of establishments that serve the public are not discriminated against on the basis of a disability. Under the circumstances, the court concludes that the plaintiffs' claim under Title III of the ADA must fail.

■ Even if the court were to construe the statute otherwise and to conclude that the plaintiffs were being denied "privileges" or "advantages" covered by Title III, the court would nevertheless be constrained to find that MDA's application of its eligibility criteria for volunteers does not amount to unlawful discrimination. Under the evidence presented, it is clear to the court that MDA has a compelling interest in selecting appropriate volunteers who can ensure the safety of the campers attending the MDA Summer Camps, most of whom are minors and many of whom have disabilities. The evidence shows that being able to assist in lifting campers—on a regular basis and in the rare event of an emergency—is (to borrow from Title I of the Act) an essential function of the position of Volunteer Counselor. It may be true that the plaintiffs are capable of performing some of the *other* functions of a volunteer counselor, and that the surplus of counselors in the past at the Wichita MDA camp has allowed the plaintiffs to work as volunteers by performing some, but not all, of the functions of a counselor. But the position of Volunteer Counselor was created for the primary purpose of providing physical assistance and supervi-

---

4. In *Menkowitz*, the court rejected the argument that Title III's coverage is limited to clients or customers. It recognized that Title III was not intended to govern discrimination in the context of employment, but found that the plaintiff could assert a claim under Title III because he was an independent contractor rather than an employee. *Id.* at 122. The court finds this reasoning unpersuasive for two reasons. First, the foregoing view unnecessarily rejects the historical understanding that public accommodation laws are designed to protect customers or patrons. Secondly, it injects Title III standards into employment and agency questions and thereby essentially re-writes the scope of Title I coverage. For example, the distinction between employees on the one hand and independent contractors on the other could lead to an anomalous situation where a small employer exempt from any requirement under Title I that it modify its facilities to make them accessible for its regular employees might nevertheless be required by Title III to make such alterations if it hires an occasional independent contractor.

sion to campers. This fact is borne out by the evidence, including the job description and recruitment literature issued by MDA. *Cf.* 29 C.F.R. § 1630.2(n) (factors relevant to determination of essential functions). *See also* Def. Exh. D & E; Pl. Exh. 4 ("Counselors push wheelchairs, lift and carry youngsters, and even 'bunk down' near their campers."). MDA may require its volunteers to perform such tasks in addition to the other responsibilities they are given. *See Anderson v. Coors Brewing Co.,* 181 F.3d 1171, 1176–1177 (10th Cir.1999) (employer may create a position, the nature of which requires an employee to perform a multitude of tasks in a wide range of environments).

Plaintiffs have not identified any reasonable modifications to MDA's policy that would allow them to perform this essential function. They basically argue that the MDA should alter the essential functions of the position or should create a new administrative position that does not involve any lifting or physically caring for campers. Such modifications, however, would not be reasonable accommodations, and are not required by the ADA. *Cf. Smith v. Midland Brake, Inc.,* 180 F.3d 1154, 1169–1170 (10th Cir.1999) (en banc) (Title I of the ADA does not require an employer to create a new position or even modify an essential function of an existing position in order to accommodate a disabled worker). MDA is not required to shift the lifting responsibilities that the plaintiffs cannot perform to other individuals at the camp. *See Martin v. Kansas,* 190 F.3d 1120, 1132 (10th Cir.1999), *overruled on other grounds by Bd. of Trustees of Univ. Ala. v. Garrett,* 531 U.S. 356, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001) (even though the plaintiff could perform most of the duties of a corrections officer, he could not respond without hesitation or limitation in an emergency, which was an inherent requirement of the position).

Additionally, the MDA has shown that its eligibility criteria are necessary for the safe operation of the camp and are also necessary to provide the privileges and advantages of the camp to the intended beneficiaries of the camp—i.e., the campers and their parents. The assurance that MDA provides to campers and their parents that all of its Volunteer Counselors are capable of caring for campers and assisting in an emergency is an important attribute of MDA's Summer Camp. The court concludes that it would fundamentally alter the nature of the services provided at the camp if MDA were required to modify its eligibility criteria and to accept Volunteer Counselors who are unable to provide such assistance. A public accommodation may impose neutral rules and criteria that are necessary for the safe operation of its business. That is what the MDA has done here. To require MDA to alter its criteria would amount to an undue burden that would require MDA to incur significant costs, increased risks to its campers, increased risk of liability, and an unreasonable shifting of resources away from the intended beneficiaries of the camp to the counselors who are there for the purpose of assisting campers. It is true that MDA has significant financial resources. But given the legitimate safety concerns that would be impacted by altering MDA's selection criteria, the long-term effect of modifying those rules could be to jeopardize the continued viability of what is a specially designed program for children with disabilities. Nothing in the ADA requires such a result. In sum, the court concludes that MDA's requirements for its Volunteer Counselors are based on legitimate and neutral criteria that are necessary for the safe operation of its Summer Camps. The court further concludes it would be an unreasonable modification and an undue hardship to require MDA to alter its selection criteria. Ac-

cordingly, even if the claim asserted by plaintiffs fell within the scope of Title III, the court would find that plaintiffs have failed to establish a right to relief under that provision of the ADA.[5]

III. *Conclusion.*

The court concludes that plaintiffs have failed to show that the MDA's application of its selection criteria for Volunteer Counselors constitutes unlawful discrimination by a public accommodation under the ADA or the KAAD. Accordingly, plaintiffs' motion (Doc. 6) and complaint for injunctive relief are denied. It is ordered that the plaintiffs shall take nothing, and that the action be dismissed on the merits.

---

**5.** Neither side has argued that the public accommodation provisions of the Kansas Act Against Discrimination differ in any significant respect from Title III of the ADA. Accordingly, for the reasons stated above the court likewise rules in favor of the MDA on plaintiffs' claim under state law.